DA 11-0494

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 38

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

RANDALL JAY DUGAN,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC-10-194C
Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wade Zolynski, Chief Appellate Defender, Kristen L. Larson (argued),
Assistant Appellate Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Tammy A. Hinderman
(argued), Assistant Attorney General, Helena, Montana

          Marty Lambert, Gallatin County Attorney, Erin Murphy, Deputy County
Attorney, Bozeman, Montana

                    Argued:  November 13, 2012
               Submitted:  November 20, 2012
                Decided:  February 19, 2013

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Randall Jay Dugan appeals from an order of the Eighteenth Judicial District Court, Gallatin County, denying his motion to dismiss a charge of using obscene, lewd, and profane language in violation of the Privacy in Communications statute, § 45-8-213, MCA. Dugan challenges the constitutionality of the Privacy in Communications statute (the statute), arguing that it is overbroad, vague, and violates his free speech rights guaranteed by the Montana and United States Constitutions. We reverse the District Court's conclusion that Dugan's speech constituted "fighting words," and strike a portion of the Privacy in Communications statute as unconstitutionally overbroad. We remand to the District Court to allow Dugan to withdraw his nolo contendere plea and proceed to trial on the charges brought against him under the statute.

## ISSUES

¶2 Dugan raises the following three issues on appeal:

¶3 1. Did the State violate Dugan's right to free speech under the First Amendment to the United States Constitution and Article II, Section 7 of the Montana Constitution when it charged him with violating the Privacy in Communications statute, § 45-8-213, MCA?

¶4 2. Is the Privacy in Communications statute, § 45-8-213, MCA, facially overbroad in violation of the First Amendment to the United States Constitution and Article II, Section 7 of the Montana Constitution?

3

¶5    3.  Is the Privacy in Communications statute, § 45-8-213, MCA, vague on its face, or as applied to Dugan, so as to violate the Due Process Clause of the United States Constitution and Article II, Section 17 of the Montana Constitution?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶6    In the lower court proceedings, the Justice Court and District Court relied on the facts as set forth in the parties' briefs concerning Dugan's motion to dismiss.  Our recitation of the facts is similarly taken from briefing before these courts.

¶7    On October 21, 2009, Dugan visited the office of the Gallatin County Victim Assistance Program (Victim Services) and requested assistance with filling out and filing paperwork for obtaining an order of protection against the mother of his children, who was about to be released from prison.  Victim Services is a joint effort of Gallatin County, the City of Bozeman, and the private nonprofit Network Against Sexual and Domestic Violence.  It is located in the Law and Justice Center in Bozeman, Montana. The office door is locked and controlled by a video-monitored entry system.  Dugan was not allowed to enter the office because he had been loud and disruptive in the past.  An employee of Victim Services, Jan Brownell, informed Dugan that the person with whom he needed to speak, Krystal Redmond-Sherrill, was not in the office at that time. Brownell told Dugan to call Redmond-Sherrill and make an appointment to discuss the order of protection.

¶8    On October 28, 2009, Dugan contacted Gallatin County Dispatch to attempt to obtain an order of protection.  Dispatch contacted Deputy Mayland of the Gallatin County Sheriff's Office and asked him to get in touch with Dugan.  Deputy Mayland

4

spoke with Dugan and Dugan told him that he was afraid the mother of his children would try to take his children when she was released from prison. Dugan reported that he spoke with Redmond-Sherrill at Victim Services, but she refused to provide him with the necessary paperwork or assistance to obtain an order of protection. Deputy Mayland contacted Victim Services to investigate Dugan's claims. Redmond-Sherrill informed Deputy Mayland that Dugan had stopped by the office a week ago and was told to make an appointment. Deputy Mayland also talked to Brownell, who told him about Dugan's past behavior. Brownell reported that the Victim Services' office staff felt threatened by Dugan.

¶9 Later that same day, Redmond-Sherrill contacted Deputy Mayland and reported that Dugan had just called her. Once again, Dugan requested assistance obtaining an order of protection. When Redmond-Sherrill informed Dugan that she could not help him and suggested that he obtain the necessary paperwork directly from the clerk of court, Dugan became aggressive and agitated. Dugan continued to argue with Redmond-Sherrill, and called her a "fucking cunt" as he hung up the phone. When Redmond-Sherrill described the conversation to Deputy Mayland, her voice was shaky and soft and he believed she was about to cry. Brownell observed that Redmond-Sherrill was visibly upset following the conversation. However, Redmond-Sherrill reported that Dugan did not threaten her or anyone else in the office. Redmond-Sherrill told Deputy Mayland that Dugan was "just really upset that—that [she wasn't] going to hand him an order of protection . . . and basically wasn't getting what he was wanting out of that conversation."

¶10 Deputy Mayland issued a citation to Dugan for violating the Privacy in Communications statute. On the citation, Deputy Mayland wrote that Dugan "called victim on telephone and used obscene, lewd and profane language, offending the victim."

¶11 Dugan appeared with counsel in Gallatin County Justice Court and filed a motion to dismiss. In his motion, Dugan argued that the charge against him violated his free speech rights under the Montana and United States Constitutions, and that the Privacy in Communications statute was unconstitutionally vague. The State opposed the motion. The Justice Court denied Dugan's motion to dismiss with no supporting analysis in the record and without providing Dugan an opportunity to file a reply brief. Following the Justice Court's denial of his motion, Dugan entered a plea of nolo contendere. Dugan was sentenced to 180 days in jail with all but five suspended, and ordered to pay fines and fees totaling $585. Dugan appealed the Justice Court's denial of his motion to dismiss to the District Court. Dugan's sentence was stayed pending appeal.

¶12 At the District Court, Dugan once again filed a motion to dismiss. Dugan contended that the charges against him violated his free speech rights, and that the Privacy in Communications statue was unconstitutionally vague and overbroad. The District Court determined that Dugan's utterance to Redmond-Sherrill constituted unprotected speech in the form of "fighting words." The District Court further concluded that the Privacy in Communications statute was not unconstitutionally vague or overbroad. Therefore, the District Court denied Dugan's motion to dismiss. Dugan appeals the District Court's decision.

**STANDARDS OF REVIEW**

6

¶13     We review de novo the denial of a motion to dismiss in a criminal case. *State v. LeMay*, 2011 MT 323, ¶ 27, 363 Mont. 172, 266 P.3d 1278.

¶14     This Court's review of constitutional questions is plenary. *Walters v. Flathead Concrete Prods.*, 2011 MT 45, ¶ 9, 359 Mont. 346, 249 P.3d 913. The constitutionality of a statute is a question of law, and we review a district court's legal conclusions for correctness. *Walters*, ¶ 9.

## DISCUSSION

¶15     *Did the State violate Dugan's right to free speech under the First Amendment to the United States Constitution and Article II, Section 7 of the Montana Constitution when it charged him with violating the Privacy in Communications statute, § 45-8-213, MCA?*

¶16     The statute under which Dugan was charged is § 45-8-213, MCA. It reads in pertinent part as follows:

> **45-8-213. Privacy in communications**. (1) Except as provided in 69-6-104, a person commits the offense of violating privacy in communications if the person knowingly or purposely:
> (a) with the purpose to terrify, intimidate, threaten, harass, annoy, or offend, communicates with a person by electronic communication and uses obscene, lewd, or profane language, suggests a lewd or lascivious act, or threatens to inflict injury or physical harm to the person or property of the person. The use of obscene, lewd, or profane language or the making of a threat or lewd or lascivious suggestions is prima facie evidence of an intent to terrify, intimidate, threaten, harass, annoy, or offend.
>
> . . .
>
> (4) "Electronic communication" means any transfer between persons of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system.

7

Section 45-8-213, MCA. As backdrop to our discussion of whether this statute infringed Dugan's free speech rights, we will analyze the protections historically accorded free speech under the United States and Montana Constitutions.

¶17 The First Amendment to the United States Constitution and Article II, Section 7 of the Montana Constitution both protect the right to free speech. The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." Montana is bound to the guarantees of the First Amendment by the Due Process Clause of the Fourteenth Amendment. *City of Whitefish v. O'Shaughnessy*, 216 Mont. 433, 438, 704 P.2d 1021, 1024 (1985) (citing *Gitlow v. New York*, 268 U.S. 652, 45 S. Ct. 625 (1925)). Article II, Section 7 of the Montana Constitution states that "[n]o law shall be passed impairing the freedom of speech or expression." Additionally, under Article II, Section 7, "[e]very person shall be free to speak . . . whatever he will on any subject, being responsible for all abuse of that liberty."

¶18 The right to free speech is a fundamental personal right and "essential to the common quest for truth and the vitality of society as a whole." *St. James Healthcare v. Cole*, 2008 MT 44, ¶ 26, 341 Mont. 368, 178 P.3d 696 (quoting *Bose Corp. v. Consumers Union*, 466 U.S. 485, 503-04, 104 S. Ct. 1949, 1961 (1984)). The "vast majority" of speech enjoys constitutional protection. *State v. Lance*, 222 Mont. 92, 102, 721 P.2d 1258, 1265 (1986). However, neither the First Amendment nor Article II, Section 7, provide unlimited protection for all forms of speech. *St. James Healthcare*, ¶ 29. The United States Supreme Court has explained that the right of free speech is not absolute at all times and under all circumstances:

8

There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.

*Chaplinsky v. N.H.*, 315 U.S. 568, 571-72, 62 S. Ct. 766, 769 (1942) (internal quotations omitted). The District Court relied on the "fighting words" categorical exception to conclude that Dugan's speech was not protected by the First Amendment.

**A. The "Fighting Words" Doctrine and the United States Supreme Court**

¶19 The United States Supreme Court first declared that "fighting words" is a category of speech not protected by the First Amendment in *Chaplinsky*, 315 U.S. at 571-72, 62 S. Ct. at 769. Chaplinsky was a Jehovah's Witness preacher who caused a disturbance after distributing religious literature on public streets and denouncing all religion as a "racket." *Chaplinsky*, 315 U.S. at 569-70, 62 S. Ct. at 768. A police officer escorted Chaplinsky to the police station, and Chaplinsky told the officer "[y]ou are a God damned racketeer" and "a damned Fascist and the whole government of Rochester are Fascists or agents of Fascists." *Chaplinsky*, 315 U.S. at 569, 62 S. Ct. at 768. Chaplinsky was convicted of violating a New Hampshire statute that stated as follows:

No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name, nor make any noise or exclamation

9

in his presence and hearing with intent to deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation.

*Chaplinsky*, 315 U.S. at 569, 62 S. Ct. at 768. The United States Supreme Court upheld Chaplinsky's conviction, holding that his speech constituted "fighting words," which can be prevented and punished without raising any First Amendment problems. *Chaplinsky*, 315 U.S. at 571-72, 62 S. Ct. at 769.

¶20 The Court defined "fighting words" as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky*, 315 U.S. at 572, 62 S. Ct. at 769. "The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight." *Chaplinsky*, 315 U.S. at 573, 62 S. Ct. at 770. The Court noted that the purpose of the statute was to "preserve the public peace," and the statute "does no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitutes a breach of the peace by the speaker." *Chaplinsky*, 315 U.S. at 573, 62 S. Ct. at 770.

¶21 Since the *Chaplinsky* decision in 1942, the United States Supreme Court has never again upheld a conviction based on the "fighting words" categorical exception. The Supreme Court has reversed the conviction each time it has reviewed a case involving "fighting words," but it has not overturned *Chaplinsky*. Therefore, "fighting words" remain a narrow and limited category of speech unprotected by the First Amendment. Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 1002 (3d. ed., Aspen Publishers 2006).

¶22    A review of post-*Chaplinsky* Supreme Court decisions reveals the limited scope of the "fighting words" categorical exception.  In *Street v. New York*, 394 U.S. 576, 89 S. Ct. 1354 (1969), the Court reversed the malicious mischief conviction of a man who had burned a flag on a public street and declared "[w]e don't need no damn flag" in response to the assassination of a civil rights leader.  The Court held that "[t]hough it is conceivable that some listeners might have been moved to retaliate upon hearing appellant's disrespectful words, we cannot say that appellant's remarks were so inherently inflammatory as to come within that small class of 'fighting words' which are 'likely to provoke the average person to retaliation, and thereby cause a breach of the peace.' " *Street*, 394 U.S. at 592, 89 S. Ct. at 1365.

¶23    The Court clarified in *Cohen v. California*, 403 U.S. 15, 91 S. Ct. 1780 (1971), that words must be directed to a specific person and likely to provoke a violent response from the hearer to constitute unprotected "fighting words."  In *Cohen*, a man was convicted of disturbing the peace for wearing a jacket bearing the words "Fuck the Draft" in the Los Angeles County Courthouse.  *Cohen*, 403 U.S. at 16, 91 S. Ct. at 1783-84.  The Court reasoned that the words on the jacket were not "fighting words" because "[n]o individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult."  *Cohen*, 403 U.S. at 20, 91 S. Ct. at 1786.  The words on the jacket were not "directed to the person of the hearer," and therefore were not "fighting words."  *Cohen*, 403 U.S. at 20, 91 S. Ct. at 1785.  Applying this same reasoning, the Court in *Texas v. Johnson*, 491 U.S. 397, 409, 109 S. Ct. 2533, 2542 (1989), reversed the conviction of a protester who burned a flag, holding that his conduct

11

did not fall within the small class of fighting words because "[n]o reasonable onlooker would have regarded Johnson's generalized expression of dissatisfaction with the policies of the Federal Government as a direct personal insult or an invitation to exchange fisticuffs."

¶24 The Supreme Court has often invalidated statutes prohibiting "fighting words" as unconstitutionally vague or overbroad. In *Gooding v. Wilson*, 405 U.S. 518, 92 S. Ct. 1103 (1972), a war protester stated the following to a police officer: "White son of a bitch, I'll kill you," "I'll choke you to death," and "if you ever put your hands on me again, I'll cut you all to pieces." *Gooding*, 405 U.S. at 520 n. 1, 92 S. Ct. at 1105 n. 1 (internal quotations marks omitted). The Court overturned the protester's conviction for violating a statute that prohibited the use of "opprobrious or abusive language, tending to cause a breach of the peace," holding that the language of the statute sweeps too broadly and could be used to punish speech that does not constitute "fighting words." *Gooding*, 405 U.S. at 527-28, 92 S. Ct. at 1108-09. Following its decision in *Gooding*, the Court reversed the conviction of a man who used the words "mother fucker" at a school board meeting to describe the teachers, the school board, the town, and the country. *Rosenfeld v. New Jersey*, 408 U.S. 901, 92 S. Ct. 2479 (1972). As *Gooding* and *Rosenfeld* illustrate, "fighting words" laws will only be upheld if they are narrowly tailored to apply to speech which is not protected by the First Amendment. Chemerinsky, *Constitutional Law*: *Principles and Policies* at 1004.

¶25 The Supreme Court's more recent decisions discussing fighting words demonstrate that even when narrowly drawn, "fighting words" statutes will not be upheld

12

unless they are content neutral. *See R. A. V. v. City of St. Paul*, 505 U.S. 377, 112 S. Ct. 2538 (1992). In *R. A. V.*, a teenager who allegedly burned a cross in the yard of a black family's home was charged under a bias-motivated crime ordinance which prohibited placing a symbol, such as a burning cross, on private property with knowledge that it would arouse "anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." *R. A. V.*, 505 U.S. at 379-80, 112 S. Ct. at 2541. Though the Minnesota Supreme Court construed the statute in a way that would only reach "fighting words," the Court held that the statute was facially unconstitutional because it prohibited otherwise permissive speech solely on the basis of the subjects the speech addresses. *R. A. V.*, 505 U.S. at 381, 112 S. Ct. at 2542. In its discussion of "fighting words," the Court stated:

> It is not true that "fighting words" have at most a "*de minimis*" expressive content, or that their content is *in all respects* "worthless and undeserving of constitutional protection;" sometimes they are quite expressive indeed. We have not said that they constitute "*no* part of the expression of ideas," but only that they constitute "no *essential* part of any exposition of ideas."

*R. A. V.*, 505 U.S. at 384-85, 112 S. Ct. at 2543-44 (internal quotations omitted) (emphasis in original). The Court went on to explain that "the exclusion of 'fighting words' from the scope of the First Amendment simply means that, for purposes of that Amendment, the unprotected features of the words are, despite their verbal character, essentially a 'nonspeech' element of communication," and are therefore analogous to a "noisy sound truck." *R. A. V.*, 505 U.S. at 386, 112 S. Ct. at 2545.

¶26    Despite the narrowness of the categorical exception for "fighting words," the Supreme Court has made clear that First Amendment concerns do not prevent a state

13

from outlawing speech that constitutes a "true threat." *See Virginia v. Black*, 538 U.S. 343, 123 S. Ct. 1536 (2003). The Court in *Black* reviewed whether a Virginia statute that banned cross burning with "an intent to intimidate a person or group of persons" and made any cross burning "prima facie evidence of an intent to intimidate a person or group of persons" violated the First Amendment. *Black*, 538 U.S. at 347-48, 123 S. Ct. at 1541-42. The Court determined that cross burning performed with an intent to threaten or intimidate is not protected by the First Amendment when it constitutes a "true threat." *Black*, 538 U.S. at 359-60, 123 S. Ct. at 1547-48. " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359, 123 S. Ct. at 1548. However, the Court invalidated the prima facie provision as unconstitutionally overbroad and held that it created an unacceptable risk of the suppression of ideas. *Black*, 538 U.S. at 364-65, 123 S. Ct. at 1550-51. The Court concluded that the prima facie evidence provision impermissibly allowed arrest, prosecution, and conviction of a person based solely on the fact of cross burning itself, which fails to distinguish between cross burning performed with an intent to threaten or intimidate and cross burning performed for other possibly permissible reasons. *Black*, 538 U.S. at 365-66, 123 S. Ct. at 1550-51.

¶27 When evaluating the scope of protection afforded to Dugan's speech, we must consider the First Amendment concerns in light of the Supreme Court's historically narrow application of the "fighting words" categorical exception.

**B. The "Fighting Words" Doctrine in Montana**

14

¶28 Montana has demonstrated a greater willingness to uphold convictions based on "fighting words." Montana cases discussing free speech rights and "fighting words" have arisen out of charges for disturbing the peace, disorderly conduct, and intimidation. These cases have often involved speech directed at police officers.

¶29 In *City of Whitefish v. O'Shaughnessy*, 216 Mont. 433, 435-36, 704 P.2d 1021, 1022-23 (1985), a police officer heard "loud hollering" at around 2:00 a.m. and went to investigate. The officer approached O'Shaughnessy and his group of friends on a city street and asked them to "hold it down." *O'Shaughnessy*, 216 Mont. at 436, 704 P.2d at 1023. O'Shaughnessy told the officer that he could not "hold it down" because it was such a "beautiful day." *O'Shaughnessy*, 216 Mont. at 436, 704 P.2d at 1023. After asking O'Shaughnessy to "keep it down" several more times and warning him of a possible arrest, O'Shaughnessy entered the back of the patrol car and was asked to get out. *O'Shaughnessy*, 216 Mont. at 436, 704 P.2d at 1023. O'Shaughnessy exited the vehicle, then re-entered the car. *O'Shaughnessy*, 216 Mont. at 436, 704 P.2d at 1023. When the officer refused to shake hands with O'Shaughnessy, O'Shaughnessy stated: "Well, [m.f.], I will holler and yell when and wherever I want if I want to." *O'Shaughnessy*, 216 Mont. at 436, 704 P.2d at 1023. O'Shaughnessy was arrested and charged with disturbing the peace under a Whitefish municipal ordinance, and was convicted following a jury trial. *O'Shaughnessy*, 216 Mont. at 434, 704 P.2d at 1022.

¶30 O'Shaughnessy challenged his conviction as a violation of his free speech rights, and also argued that the ordinance was unconstitutionally vague and overbroad. *O'Shaughnessy*, 216 Mont. at 439, 704 P.2d at 1025. This Court held that

15

O'Shaughnessy's speech constituted unprotected "fighting words" pursuant to *Chaplinsky*. *O'Shaughnessy*, 216 Mont. at 438-39, 704 P.2d at 1024. We rejected the vagueness and overbreadth challenges, concluding that the ordinance was narrowly construed to only apply "to words that have a direct tendency to violence and which are willfully and maliciously uttered." *O'Shaughnessy*, 216 Mont. at 442-43, 704 P.2d at 1027.

¶31 Later that same year, the Court decided another "fighting words" case, *City of Billings v. Batten*, 218 Mont. 64, 705 P.2d 1120 (1985). In *Batten*, an argument broke out between neighbors and Batten called his neighbor "a communist government worker, no good son-of-a-bitch, chickenshit, and m---r" and stated: "Fight me. Hit me. You have a golf club. Come on. I want to fight you." *Batten*, 218 Mont. at 67, 705 P.2d at 1122. While the face-to-face confrontation ensued, Batten yelled "come back and fight you m---r." *Batten*, 218 Mont. at 67-68, 705 P.2d at 1123. Batten was found guilty of disorderly conduct following a jury trial. *Batten*, 218 Mont. at 66, 705 P.2d at 1121. On appeal, this Court held that Batten's speech constituted "fighting words" because he directly challenged a person to and nearly provoked a fight, causing such concern that one of the neighbors ran away from the confrontation. *Batten*, 218 Mont. at 69-70, 705 P.2d at 1124. Next, we concluded that the disorderly conduct statute, § 45-8-101, MCA, was not unconstitutionally vague or overbroad. *Batten*, 218 Mont. at 70, 705 P.2d at 1124-25. Relying on *O'Shaughnessy*, the Court reasoned that when the disorderly conduct statute is construed to apply only to words uttered knowingly that have a direct

tendency to violence, the statute is constitutional. *Batten*, 218 Mont. at 70, 705 P.2d at 1125.

¶32 In *State v. Lance*, 222 Mont. 92, 721 P.2d 1258 (1986), a defendant challenged his conviction for intimidation under § 45-5-203(1)(b), MCA, on First Amendment grounds. Lance was found guilty of intimidation for sending multiple letters in which he described his plans to take hostages to gain media attention for what he perceived were wrongs committed against him by judges and attorneys. *Lance*, 222 Mont. at 96-97, 721 P.2d at 1261-62. First, this Court held that the statute was not facially overbroad because it only prohibited speech in the form of threats to subject any person to physical confinement or restraint, without lawful authority, with the purpose of causing another to perform or omit the performance of any act. *Lance*, 222 Mont. at 101, 721 P.2d at 1264. The Court determined that the State had a legitimate and considerable interest in preventing persons from threatening to take hostages for the purpose of attaining some end, and Lance failed to identify any substantial application of the statute to constitutionally protected speech. *Lance*, 222 Mont. at 101, 721 P.2d at 1264-65. Next, we held that the type of "true threat" prohibited by the statute was not speech protected by the First Amendment. *Lance*, 222 Mont. at 104, 721 P.2d at 1267.

¶33 This Court's most recent "fighting words" case involved a disturbing the peace charge arising from a confrontation with a police officer. *State v. Robinson*, 2003 MT 364, 319 Mont. 82, 82 P.3d 27. Robinson was crossing an intersection in front of a police car when he glared at the waiting police officer and called him a "fucking pig." *Robinson*, ¶ 3. The officer parked his car and approached Robinson. *Robinson*, ¶ 4. The

17

officer asked Robinson if there was anything he wanted to talk about, to which Robinson replied "[f]uck off, asshole." *Robinson*, ¶ 4. The officer arrested Robinson for disorderly conduct, in violation of § 45-8-101, MCA. *Robinson*, ¶ 4. Robinson filed a motion to dismiss that the district court denied, then pled nolo contendere to reserve his right to appeal. *Robinson*, ¶¶ 5-6. On appeal, Robinson argued that the district court erred in denying his motion to dismiss and concluding that his statements to the police officer were "fighting words." *Robinson*, ¶ 8. We affirmed the district court's determination that his speech constituted "fighting words" because it was "sufficiently and inherently inflammatory." *Robinson*, ¶ 24. The Court explained:

> If the statements in question had been uttered in the context of a political rally or protest, free speech concerns might well prevail. However, we fail to see how randomly goading a police officer by calling him a "f****** pig" adds to our constitutionally-protected social discourse.

*Robinson*, ¶ 22.[1]

¶34 Though this Court has addressed "fighting words" in other contexts, it has never discussed this categorical exception in connection with Montana's Privacy in Communications statute, § 45-8-213, MCA.

**C. The District Court Erred in Deeming Dugan's Speech "Fighting Words"**

¶35 The District Court relied on *Chaplinsky*, *Robinson*, and *O'Shaughnessy* in determining that Dugan's statement to Redmond-Sherrill constituted "fighting words." The District Court reasoned that Dugan's speech was "inherently inflammatory," was not

---

[1] The author of this Opinion dissented in *Robinson*, disagreeing with the majority on the basis that "a trained officer should be expected to exercise a higher degree of restraint than the average citizen." *Robinson*, ¶ 31 (Cotter, J., dissenting).

18

an essential part of any exposition of ideas, and of "such slight social value" that any benefit was "clearly outweighed by the social interest in order and morality."

¶36 Dugan argues that his words were not "fighting words" because they were not uttered in a public place or in a face-to-face setting. Furthermore, Dugan contends that his speech created no danger of an imminent breach of the peace. The State counters that Dugan's statement inflicted injury by its very utterance as "the equivalent of a verbal sucker punch in the face." The State asserts that Dugan's words were inherently likely to evoke a violent reaction, and the fact that the speech occurred during a telephone call does not limit its qualification as "fighting words."

¶37 All of the "fighting words" cases relied upon by the District Court involved face-to-face communications. The seminal "fighting words" case, *Chaplinsky*, clearly contemplated some level of physical proximity between the speaker and his audience. In upholding the "fighting words" conviction, the Supreme Court in *Chaplinsky* stated that: "The statute, as construed, does no more than prohibit the *face-to-face* words plainly likely to cause a breach of the peace by the addressee." *Chaplinsky*, 315 U.S. at 573, 62 S. Ct. at 770 (emphasis added). Furthermore, limiting the "fighting words" categorical exception to face-to-face communications is consistent with the underlying purpose of the doctrine, which is "to preserve the public peace" by forbidding only those words that have a "direct tendency to cause acts of violence." *Chaplinsky*, 315 U.S. at 573, 62 S. Ct. at 770. The Montana "fighting words" cases, *O'Shaughnessy*, *Batten*, *Lance*, and *Robinson*, likewise all involved face-to-face communications. In fact, the State was unable to point to a single "fighting words" case in which a conviction passed

19

constitutional muster when the subject communication did not occur in the physical presence of the listener.

¶38    Other courts have recognized the proximal limitations of the "fighting words" doctrine and have refused to extend it beyond face-to-face communication. In *Anniskette v. State*, 489 P.2d 1012, 1013 (Alaska 1971), a man was charged with disorderly conduct for calling an Alaska State Trooper on his home telephone and complaining at length about the trooper's ineffectiveness and lack of qualifications. The caller referred to the trooper as a "no good God-damn cop." *Anniskette*, 489 P.2d at 1013 n. 1. The Alaska Supreme Court determined that the caller's telephonic communication did not fall within the category of "fighting words" because the "time necessary for the officer to travel from his residence to that of the defendant should have allowed enough cooling off so that any desire on the part of the officer to inflict violence on the defendant should have been dissipated." *Anniskette*, 489 P.2d at 1014-15. The Court dismissed the charges against the caller after holding that the caller's speech was entitled to First Amendment protection. *Anniskette*, 489 P.2d at 1015-16.

¶39    Courts have even refused to classify speech as "fighting words" when the communication occurs in person but the speaker and the addressee are not in close physical proximity. In *Hershfield v. Commonwealth*, 417 S.E.2d 876 (Va. App. 1992), a man was convicted of violating a Virginia statute that prohibits abusive language after he told his neighbor to "go f___ yourself." The speaker was standing in his yard two houses down the street from the addressee when he uttered the statement. *Hershfield*, 417 S.E.2d at 876. The court overturned his conviction, holding that the statute must only apply to

20

"fighting words" to comply with constitutional concerns. *Hershfield*, 417 S.E.2d at 877. The court determined that his speech did not constitute "fighting words" because it did not occur face-to-face. *Hershfield*, 417 S.E.2d at 878. Even though the abusive language was uttered in the presence of another in the literal sense that the listener could see and hear the speaker, the encounter was not face-to-face because the parties were separated by a distance of 55 to 60 feet and by a fence. *Hershfield*, 417 S.E.2d at 877-78. Under these circumstances, the distance and barriers between the parties precluded an immediate, violent reaction. *Hershfield*, 417 S.E.2d at 877-78.

¶40    The Minnesota Supreme Court suggested an even narrower application of the face-to-face requirement in *In re Welfare of S.L.J.*, 263 N.W.2d 412 (Minn. 1978). In *S.L.J.*, a 14-year-old girl was questioned by two police officers who had just apprehended some teenage boys in the area. *S.L.J.*, 263 N.W.2d at 415. After asking her some questions, the officers urged her to hurry home because it was past her curfew. *S.L.J.*, 263 N.W.2d at 415. The girl headed down an alley and walked until she was somewhere between 15 and 30 feet away from the squad car, at which point she turned around and said "fuck you pigs." *S.L.J.*, 263 N.W.2d at 415. The officers exited their vehicle and arrested the girl for disorderly conduct. *S.L.J.*, 263 N.W.2d at 415. The Minnesota Supreme Court reversed the girl's disorderly conduct conviction, holding that her words were not "fighting words" because they were "spoken in retreat from more than 15 feet away rather than eye-to-eye, [and] there was no reasonable likelihood that they would tend to incite an immediate breach of the peace or to provoke violent reaction by an ordinary, reasonable person." *S.L.J.*, 263 N.W.2d at 420.

21

¶41　In light of these cases, and the principles underlying the "fighting words" doctrine and its intersection with free speech rights, many authorities on the subject have concluded that:

> Insulting language must be spoken in close physical proximity to the addressee to be considered fighting words. Otherwise, the burden is on the addressee to "cool off." Thus, insults over the telephone may never constitute fighting words because the time necessary to initiate violence with the caller should be enough to cool the temper of the average person.

Michael J. Mannheimer, *The Fighting Words Doctrine*, 93 Colum. L. Rev. 1527, 1554 (1993); *see also* Burton Caine, *The Trouble with "Fighting Words":* Chaplinsky v. New Hampshire *is a Threat to First Amendment Values and Should be Overturned*, 88 Marq. L. Rev. 441, 450-51 (2004) (listing the possibilities suggested in *Chaplinsky* for defining "fighting words" and concluding that communication by telephone is not a permissible application of the doctrine); Thomas W. Korver, Student Author, State v. Robinson: *Free Speech or Itchin' for a Fight*, 65 Mont. L. Rev. 385, 393 (2004) (the words must be addressed to the person face-to-face); Jennifer Elrod, *Expressive Activity, True Threats, and the First Amendment*, 36 Conn. L. Rev. 541, 576 (2004) (The "fighting words" doctrine assumes close physical proximity, face-to-face confrontations, and imminent or immediate physical responses or reactions to the speaker's statements).

¶42　We agree with the proposition that "there is little likelihood of an immediate breach of the peace when one can abruptly hang up the receiver." *Walker v. Dillard*, 523 F.2d 3, 5 n. 7 (4th Cir. 1975). Here, Dugan said the words "fucking cunt" over the telephone to Redmond-Sherrill. Dugan's speech did not occur face-to-face with Redmond-Sherrill, as is required for speech to constitute "fighting words" pursuant to

*Chaplinsky* and its progeny. As discussed in *Anniskette, Hershfield,* and *S.L.J.*, the face-to-face requirement supports the underlying purpose of the "fighting words" doctrine, which is to preserve the public peace and prevent immediate incitement of violence.

¶43    Words spoken over the telephone are not proscribable under the "fighting words" doctrine because the person listening on the other end of the line is unable to react with imminent violence against the caller. Redmond-Sherrill was in her office at the time of the phone call. Her office is located behind locked doors controlled by a video-monitored entry system. Nothing in the record suggests that she knew Dugan's location when he called her, and no facts indicate that Dugan was located near the Law and Justice Center when he placed the phone call. Under these circumstances, the face-to-face requirement of the "fighting words" doctrine cannot be satisfied.

¶44    The District Court focused on the "slight social value" of Dugan's speech and the fact that his words constituted "no essential part of any exposition of ideas" in concluding that his words were punishable without offending free speech rights. The Supreme Court has clarified the language in *Chaplinsky* that described unprotected categories of speech as being "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *See U.S. v. Stevens*, ___ U.S. ___, ___, 130 S. Ct. 1577, 1585 (2010). The Supreme Court noted that such descriptions of unprotected categories of speech are just that—descriptive. *Stevens*, ___ U.S. at ___, 130 S. Ct. at 1586. "They do not set forth a test that may be applied as a general matter to permit the Government to imprison any speaker so long as his speech is

23

deemed valueless or unnecessary, or so long as an ad hoc calculus of costs and benefits tilts in a statute's favor." *Stevens*, ___ U.S. at ___, 130 S. Ct. at 1586. While Dugan's utterance was certainly not of high social value, essential in any sense, or beneficial to the pursuit of truth, it is not automatically rendered proscribable on the basis of these shortcomings.

¶45 A review of "fighting words" cases makes clear that the "mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected." *R. A. V.*, 505 U.S. at 414, 112 S. Ct. at 2559 (White, Blackmun, O'Connor & Stevens, JJ., concurring). Though Dugan's choice of words was among the most distasteful in our vocabulary, if we are to preserve the free speech rights enshrined in the Montana and United States Consitutions, we must recognize that "the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us." *Cohen*, 403 U.S. at 25, 91 S. Ct. at 1788. The context suggests that Dugan's speech was uttered in exasperation and frustration.

> [C]urses, oaths, expletives, execrations, imprecations, maledictions, and the whole vocabulary of insults are not intended or susceptible of literal interpretation. They are expressions of annoyance and hostility—nothing more. . . . Their significance is emotional, and it is not merely immensurable but also variable. The emotional quality of exclamations varies from time to time, from region to region, and as between social, cultural, and ethnic groups.

*St. Paul v. Morris*, 104 N.W.2d 902, 910 (Minn. 1960) (Loevinger, J., dissenting). Expletives and insults, no matter how distasteful, can be constitutionally proscribed only if they fall within one of the narrow and limited categories of unprotected speech.

¶46    We are likewise not persuaded by the State's argument that Dugan's speech was punishable under the captive audience doctrine.  The Supreme Court has applied the captive audience doctrine "sparingly to protect unwilling listeners from protected speech." *Snyder v. Phelps*, ___ U.S. ___, ___, 131 S. Ct. 1207, 1220 (2011).  The ability of the government to constitutionally shut off discourse solely to protect others from hearing it depends on "a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen*, 403 U.S. at 21, 91 S. Ct. at 1786.  "Outside the home, the balance between the offensive speaker and the unwilling audience may sometimes tip in favor of the speaker, requiring the offended listener to turn away." *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 749 n. 27, 98 S. Ct. 3026, 3040 n. 27 (1978). While the government may act in limited situations to prohibit intrusion into the privacy of the home, the Supreme Court has "consistently stressed that we are often captives outside the sanctuary of the home and subject to objectionable speech." *Cohen*, 403 U.S. at 21, 91 S. Ct. at 1786 (internal quotations omitted).

¶47    Given the Supreme Court's sparing application of the captive audience doctrine, we conclude that it does not apply under these circumstances.  Redmond-Sherrill was not in her home when she received the telephone call from Dugan.  Redmond-Sherrill was using a business phone at Victim Services, an entity that holds itself out to the public to provide assistance.  Dugan's phone call was made to elicit those services.  The charges against Dugan stem from a single phone call.  Dugan immediately hung up the phone after making his objectionable utterance, but even if he had not done so, Redmond-Sherrill had the power at any moment to end the communication by simply

25

hanging up the phone. The privacy interests of a public employee at Victim Services are certainly less substantial than the privacy interests that a private citizen enjoys while in her residence. Under these facts, the State has failed to show that Redmond-Sherrill's substantial privacy interests were invaded in an essentially intolerable manner.

¶48 Dugan's speech did not constitute an unprotected "true threat." Calling Redmond-Sherrill a "fucking cunt" is not a statement meant to communicate an intent to commit an act of unlawful violence against her. *See Black*, 538 U.S. at 359, 123 S. Ct. at 1548. Redmond-Sherrill admitted that Dugan did not threaten her or anyone else at Victim Services during the phone call. Furthermore, Dugan's words were not unprotected obscenity. Obscene material must be erotic in some significant way and appeal to the prurient interest in sex. *See Cohen*, 403 U.S. at 20, 91 S. Ct. at 1785; § 45-8-201(2), MCA. The words used by Dugan could constitute obscenity under different circumstances, but the context suggests that he uttered the words in frustration and his use is not subject to a literal interpretation.

¶49 We hold that the District Court erred in deeming Dugan's speech unprotected "fighting words." This Court and the United States Supreme Court have applied the "fighting words" doctrine only to face-to-face interactions and in circumstances likely to cause an immediate breach of the peace. We see no reason to extend the doctrine beyond its historically narrow and limited reach. Thus, Dugan's words do not fall under one of the categorical exceptions to free speech protections guaranteed by the Montana and United States Constitutions.

¶50 It is important to note that in reaching the foregoing conclusion, we do not foreclose Dugan's prosecution under the statute. Prosecution for his actions in this case does not violate Dugan's free speech rights because the statute only proscribes communication made "with the purpose to terrify, intimidate, threaten, harass, annoy or offend." Section 45-8-213(1)(a), MCA. As further explained below, the requirement that the State prove Dugan's statement was made with a specific intent removes the danger of criminalizing protected speech.

¶51 *Is the Privacy in Communications statute, § 45-8-213, MCA, facially overbroad in violation of the First Amendment to the United States Constitution and Article II, Section 7 of the Montana Constitution?*

¶52 "An over-broad statute is one that is designed to burden or punish activities which are not constitutionally protected, but the statute includes within its scope activities which are protected by the First Amendment." *State v. Nye*, 283 Mont. 505, 515, 943 P.2d 96, 102 (1997). The crucial question in addressing an overbreadth challenge is whether the statute sweeps within its prohibitions what may not be punished constitutionally. *O'Shaughnessy*, 216 Mont. at 440, 704 P.2d at 1026; *Grayned v. City of Rockford*, 408 U.S. 104, 114-15, 92 S. Ct. 2294, 2302 (1972). Even if an enactment is clear and precise, it may nevertheless be deemed overbroad if it reaches constitutionally protected conduct. *O'Shaughnessy*, 216 Mont. at 440, 704 P.2d at 1026.

¶53 Dugan asserts that the statute is facially overbroad. "[A]n individual whose own speech or expressive conduct may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so

27

rather than risk prosecution or undertake to have the law declared partially invalid."

*Lance*, 222 Mont. at 99, 721 P.2d at 1263 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503, 105 S. Ct. 2794, 2801-02 (1985)).

¶54 We restate the pertinent provisions of Montana's Privacy in Communications statute, § 45-8-213, MCA, as follows:

> **45-8-213. Privacy in communications**. (1) Except as provided in 69-6-104, a person commits the offense of violating privacy in communications if the person knowingly or purposely:
> (a) with the purpose to terrify, intimidate, threaten, harass, annoy, or offend, communicates with a person by electronic communication and uses obscene, lewd, or profane language, suggests a lewd or lascivious act, or threatens to inflict injury or physical harm to the person or property of the person. The use of obscene, lewd, or profane language or the making of a threat or lewd or lascivious suggestions is prima facie evidence of an intent to terrify, intimidate, threaten, harass, annoy, or offend.
>
> .   .   .
>
> (4) "Electronic communication" means any transfer between persons of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system.

Dugan's citation stated that he "called victim on telephone and used obscene, lewd and profane language, offending the victim" in violation of § 45-8-213(1)(a), MCA.

¶55 The District Court determined that Dugan's overbreadth challenge must fail because it was "based purely on speculation and is not real and substantial." Dugan argues that the Privacy in Communications statute is overbroad because it makes the "use of obscene, lewd, or profane language . . . prima facie evidence of an intent to terrify, intimidate, threaten, harass, annoy, or offend." Dugan contends that the statutory presumption of intent to offend impermissibly allows the State to punish more speech

28

than is constitutionally proscribable under the First Amendment. The State asserts that because Dugan pled guilty to the charge, there is no evidence that Montana courts have applied the presumption of intent in ways that violate free speech rights. The State argues that Dugan has failed to demonstrate how the statute might infringe on the freedom of speech of others in a real and substantial way in comparison to the statute's wide variety of constitutional applications. The State also points to decisions from other jurisdictions that have rejected overbreadth challenges to similar telephone harassment statutes.

¶56 This Court determined that the disturbing the peace ordinance in *O'Shaughnessy* was not overbroad after finding that the ordinance had been constitutionally construed:

> We affirm the narrow construction on the part of the District Court in construing the Whitefish Ordinance through its instructions, which required that not only must the defendant have willfully and maliciously disturbed the peace by uttering the language in question, but that the words and language of the defendant must have been of such a nature that men of common intelligence would understand that the words were likely to cause an average person to fight and with the further instruction that threatening, profane and obscene words, said without a disarming smile, are generally considered to be "fighting words." Because we construe the Whitefish Ordinance narrowly as only applying to words that have a direct tendency to violence and which are willfully and maliciously uttered, we conclude that the Ordinance is not unconstitutional for vagueness and overbreadth.

*O'Shaughnessy*, 216 Mont. at 442-43, 704 P.2d at 1027. The statute was not overbroad because it was effectively construed to only punish "fighting words," which can be proscribed without offending the First Amendment.

¶57 This Court similarly concluded in *Lance* that the intimidation statute was not unconstitutionally overbroad. We determined that the statute was narrowly construed to

29

prohibit only "true threats," which are constitutionally unprotected much like "fighting words." *Lance*, 222 Mont. at 103-04, 721 P.2d at 1266. Lance was unable to identify and the Court was unable to find any situations where a person would be constitutionally permitted to make such a threat. *Lance*, 222 Mont. at 101, 721 P.2d at 1264-65. Citing the rule that "the overbreadth of a statute must not only be real, but substantial as well," the Court refused to facially invalidate the statute on overbreadth grounds. *Lance*, 222 Mont. at 100-01, 721 P.2d at 1264-65.

¶58 The statutes at issue in *O'Shaughnessy* and *Lance* did not contain a prima facie evidence provision. For guidance on interpreting this provision, we turn back to the United States Supreme Court's decision in *Virginia v. Black*. The Virginia statute in question in *Black* banned cross burning with "an intent to intimidate a person or group of persons" and made any cross burning "prima facie evidence of an intent to intimidate a person or group of persons." *Black*, 538 U.S. at 347-48, 123 S. Ct. at 1541-42. While the Court recognized that cross burning performed with an intent to threaten or intimidate is a "true threat" not protected by the First Amendment, the Court invalidated the prima facie provision as unconstitutionally overbroad. *Black*, 538 U.S. at 364-65, 123 S. Ct. at 1550-51. The Court explained as follows:

> [T]he prima facie provision strips away the very reason why a State may ban cross burning with the intent to intimidate. The prima facie evidence provision permits a jury to convict in every cross-burning case in which defendants exercise their constitutional right not to put on a defense. And even where a defendant like Black presents a defense, the prima facie evidence provision makes it more likely that the jury will find an intent to intimidate regardless of the particular facts of the case. The provision permits the Commonwealth to arrest, prosecute, and convict a person based solely on the fact of cross burning itself.

*Black*, 538 U.S. at 365, 123 S. Ct. at 1550-51. The prima facie provision was struck down as unconstitutionally overbroad because the First Amendment does not permit the fact-finder to ignore all of the contextual factors in determining whether a particular cross burning was committed with an intent to intimidate. *Black*, 538 U.S. at 367, 123 S. Ct. at 1551.

¶59    The Nebraska Supreme Court invalidated a nearly identical prima facie provision in *State v. Kipf*, 450 N.W.2d 397 (Neb. 1990). Kipf was charged with intimidation by telephone under a statute with a provision that stated: "The use of indecent, lewd, or obscene language or the making of a threat or lewd suggestion shall be prima facie evidence of intent to terrify, intimidate, threaten, harass, annoy, or offend." *Kipf*, 450 N.W.2d at 402. The Court invalidated the prima facie language and concluded that a jury instruction based on the statute was unconstitutional because it deprived defendants of the due process right to have the State prove beyond a reasonable doubt each element of the crime charged, and impermissibly shifted the burden to the defendant to disprove the element of intent in the offense charged. *Kipf*, 450 N.W.2d at 413. The Court determined that a jury instruction applying the prima facie language would, in the absence of a defendant's presentation of evidence negating the intent established by the prima facie provision, have the legal effect of a directed verdict on the issue of criminal intent as an element of the offense. *Kipf*, 450 N.W.2d at 413.

¶60    Further support for invalidating similar prima facie language is found in *Baker v. State*, 494 P.2d 68 (Ariz. App. 1972). The prima facie provision in *Baker* stated that:

31

"The use of obscene, lewd or profane language or the making of a threat or statement as set forth in this section shall be prima facie evidence of intent to terrify, intimidate, threaten, harass, annoy or offend." *Baker*, 494 P.2d at 70. The court invalidated the prima facie language for failing to make a rational connection between the proven fact and the presumed fact:

> The test is whether the inference upon which the presumption is based can be sustained by common experience and the circumstances of life. It is our observation that nowadays, obscene, lewd or profane language is not uncommonly used between individuals without any intent to terrify, intimidate, threaten, harass, annoy or offend. We accordingly do not believe that it is rational to assume that merely because a person uses obscene, lewd or profane language over the telephone one can conclude the person is doing so with the intent proscribed by the statute.

*Baker*, 494 P.2d at 71-72 (citations omitted).

¶61 Just as free speech concerns did not permit the shortcut offered by the prima facie evidence provision in *Black*, *Kipf*, and *Baker*, we find that the same holds true here. Montana's Privacy in Communications statute, § 45-8-213, MCA, makes the "use of obscene, lewd, or profane language . . . prima facie evidence of an intent to terrify, intimidate, threaten, harass, annoy, or offend" with no regard to the circumstances and facts of the particular case. As such, it presents a substantial and real danger of infringing on the free speech rights of others. For example, a person who was talking on the phone and accidentally stubbed his toe might inadvertently say a profane word. The prima facie provision would ignore the facts of the case and automatically presume that he uttered the profane word with "an intent to terrify, intimidate, threaten, harass, annoy, or offend." As discussed in *Baker*, it is not rational to assume based on mere use of certain types of

language over the telephone that the person is doing so with the intent proscribed by the statute.

¶62 Though Dugan is not asserting an as-applied overbreadth challenge, the alleged facts of his case are illustrative. Dugan called Redmond-Sherrill to request assistance in filing an order of protection. He placed the call for a legitimate reason. However, because he became incredibly frustrated when Redmond-Sherrill refused to help him and he went on to say the words "fucking cunt" in exasperation, the prima facie provision creates the presumption that the purpose of his call was to "terrify, intimidate, threaten, harass, annoy, or offend" Redmond-Sherrill. Such a conclusion is unwarranted under the circumstances. We recognize that "a statute cannot be challenged just because it might result in an unconstitutional abridgment of speech in a hypothetical case." *State v. Allum*, 2005 MT 150, ¶ 29, 327 Mont. 363, 114 P.3d 233. However, when judged in relation to the statute's plainly legitimate sweep, the unconstitutional overbreadth is both "real" and "substantial." *Allum*, ¶ 29. There is a realistic danger that the statute itself will significantly compromise recognized free speech rights of parties not before the Court, especially considering the volume and variety of electronic communication that takes place in today's world.

¶63 We hold that the prima facie provision of the Privacy in Communications statute, § 45-8-213, MCA, is facially overbroad. It is well-established that "the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected." *Lance*, 222 Mont. at 99, 721 P.2d at 1264; *Brockett*,

472 U.S. at 502, 105 S. Ct. at 2801. We strike the following language from § 45-8-213, MCA, as unconstitutionally overbroad: "The use of obscene, lewd, or profane language or the making of a threat or lewd or lascivious suggestions is prima facie evidence of an intent to terrify, intimidate, threaten, harass, annoy, or offend."

¶64 Though the statute was only designed to burden or punish activities which are not constitutionally protected, the statute includes within its scope activities which are protected by the First Amendment. Therefore, the statute sweeps within its prohibitions speech which may not be punished constitutionally. With the prima facie provision invalidated, Montana's Privacy in Communications statute legitimately encompasses only those electronic communications made with the purpose to terrify, intimidate, threaten, harass, annoy, or offend. Such communications can be proscribed without violating the Montana and United States Constitutions.

¶65 *Is the Privacy in Communications statute, § 45-8-213, MCA, vague on its face, or as applied to Dugan, so as to violate the Due Process Clause of the United States Constitution and Article II, Section 17 of the Montana Constitution?*

¶66 A vagueness challenge to a statute may be maintained under two different theories: (1) because the statute is so vague that it is rendered void on its face; or (2) because it is vague as applied in a particular situation. *State v. Watters*, 2009 MT 163, ¶ 24, 350 Mont. 465, 208 P.3d 408; *Nye*, 283 Mont. at 513, 943 P.2d at 101. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *O'Shaughnessy*, 216 Mont. at 440, 704 P.2d at 1025; *Grayned*, 408 U.S. at 108, 92 S. Ct. at 2298. Vague laws offend the following important values:

34

First, we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.

*O'Shaughnessy*, 216 Mont. at 440, 704 P.2d at 1025-26; *Grayned*, 408 U.S. at 108-09, 92 S. Ct. at 2298-99 (internal quotations omitted) (citations omitted). We review Dugan's as-applied and facial vagueness challenges with these considerations in mind.

¶67 A statute is void on its face "if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *Nye*, 283 Mont. at 513, 943 P.2d at 101. For vague-as-applied challenges, a court must determine whether the statute in question provides a person with "actual notice" and whether it provides "minimal guidelines" to law enforcement. *Watters*, ¶ 32. To determine whether the challenged statute provides "actual notice," courts examine the statute in light of the defendant's conduct to determine if the defendant reasonably could have understood that the statute prohibited such conduct. *Watters*, ¶ 32.

¶68 The District Court determined that the Privacy in Communications statute, § 45-8-213, MCA, was neither facially vague nor vague as applied. Dugan contends that the statute is void for vagueness on its face because it incorporates but does not further

define what it means to "offend" in the course of using "obscene, lewd, or profane language." Dugan argues that the statute fails to sufficiently explain what words, said under what circumstances, would constitute a violation of the statute. As such, Dugan asserts that he could not have understood what words he was allowed to say and what words would subject him to prosecution.

¶69 The failure to include exhaustive definitions of every term employed in a statute will not automatically render a statute overly vague, so long as the meaning of the statute is clear and provides a defendant sufficient notice of what conduct is proscribed. *Nye*, 283 Mont. at 513, 943 P.2d at 101-02. In *Nye*, a defendant challenged the statute setting forth the crime of malicious intimidation or harassment, § 45-5-221, MCA, as unconstitutionally vague. *Nye*, 283 Mont. at 514, 943 P.2d at 102. The statute made it unlawful to "purposely or knowingly, with the intent to terrify, intimidate, threaten, harass, annoy, or offend" damage, destroy, or deface property because of another person's "race, creed, religion, color, national origin, or involvement in civil rights or human rights activities." Section 45-5-221, MCA. In upholding the statute, this Court explained that the terms "annoy" and "offend" have commonly understood meanings: "[a]nnoy means to bother, irritate or harass, particularly by repeated acts," and "[o]ffend means to create or excite anger, resentment or annoyance or to cause displeasure." *Nye*, 283 Mont. at 513-14, 943 P.2d at 102. We determined that these terms were of common usage and were readily understandable, so a reasonable person of average intelligence could comprehend their meaning. *Nye*, 283 Mont. at 514, 943 P.2d at 102; *see also State*

36

*v. Martel*, 273 Mont. 143, 902 P.2d 14 (1995) (holding that Montana's anti-stalking statute was not unconstitutionally vague).

¶70 The requirement of a mental state to do a prohibited act can render an otherwise vague or indefinite statute constitutional. *Nye*, 283 Mont. at 514, 943 P.2d at 102; *Martel*, 273 Mont. at 152, 902 P.2d at 19-20; *Screws v. U.S.*, 325 U.S. 91, 101, 65 S. Ct. 1031, 1035 (1945). As we have previously noted, "if the challenged statute is reasonably clear in its application to the conduct of the person bringing the challenge, it cannot be stricken on its face for vagueness." *Nye*, 283 Mont. at 514, 943 P.2d at 102; *State v. Lilburn*, 265 Mont. 258, 270, 875 P.2d 1036, 1044 (1994); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S. Ct. 1186, 1193 (1982). In *Lilburn*, we held that a hunter could not challenge a hunter harassment statute for facial vagueness when his conduct of standing between a hunter and a bison to prevent the animal from being shot was unquestionably proscribed by the statute he was challenging. *Lilburn*, 265 Mont. at 270-71, 875 P.2d at 1044.

¶71 Other jurisdictions have concluded that statutes similar to Montana's Privacy in Communications statute are not impermissibly vague. The Idaho Court of Appeals held in *State v. Richards*, 896 P.2d 357 (Idaho App. 1995), that a statute prohibiting a person from telephoning another and using "obscene, lewd or profane language" with "the intent to annoy, terrify, threaten, intimidate, harass or offend" was not unconstitutionally vague. The court determined that the words used in the statute required the caller to harbor a specific intent to cause emotional harm to the listener, and were sufficiently narrow and specific to inform persons of reasonable intelligence of the type of language prohibited.

*Richards*, 896 P.2d at 364; *see also Kipf*, 450 N.W.2d at 405-06; *Baker*, 494 P.2d at 70-71; *State v. Crelly*, 313 N.W.2d 455 (S.D. 1981); *State v. Gattis*, 730 P.2d 497, 502-03 (N.M. App. 1986); *State v. Jaeger*, 249 N.W.2d 688, 691-92 (Iowa 1977).

¶72 Montana's Privacy in Communications statute, § 45-8-213, MCA, contains a nearly identical mental state as the one at issue in *Nye*. The State must prove that a defendant acted "with the purpose to terrify, intimidate, threaten, harass, annoy or offend." Section 45-8-213(1)(a), MCA. Furthermore, the terms "obscene, lewd, or profane" are of common usage and readily understandable by a reasonable person of average intelligence. The fact that these terms are not defined in the statute does not render it void for vagueness. The subject statute clearly provides law enforcement with the requisite minimal guidelines for its enforcement. Dugan's use of the words "fucking cunt" is unquestionably proscribed under any reasonable definition of these terms. As the State points out, "cunt" is one of the most vulgar and offensive words in the English language. When combined with "fucking," another patently offensive term, Dugan's communication may qualify as "obscene, lewd, or profane." Following our decisions in *Nye* and *Lilburn*, Dugan's facial challenge to § 45-8-213, MCA, must fail because "the challenged statute is reasonably clear in its application to the conduct of the person bringing the challenge." *Nye*, 283 Mont. at 514, 943 P.2d at 102. We hold that Montana's Privacy in Communications statute, § 45-8-213, MCA, is not unconstitutionally vague.

## CONCLUSION

38

¶73 For the foregoing reasons, we reverse the District Court's conclusion that Dugan's speech constituted "fighting words." Next, we strike the prima facie provision of Montana's Privacy in Communications statute, § 45-8-213, MCA, as unconstitutionally overbroad. Lastly, we remand to the District Court to allow Dugan to withdraw his nolo contendere plea pursuant to § 46-12-204(3), MCA, and proceed to trial. At trial, the State must prove that Dugan violated the Privacy in Communications statute by "knowingly or purposely" using "obscene, lewd, or profane language" on the telephone with Redmond-Sherrill "with the purpose to . . . offend" her.


/S/ Patricia Cotter

We concur:

/S/ MIKE MCGRATH
/S/ BRIAN MORRIS
/S/ MICHAEL E WHEAT
/S/ BETH BAKER

/S/ RANDAL I. SPAULDING
District Court Judge Randal I. Spaulding
sitting for Justice James C. Nelson


Justice Jim Rice concurring in part, dissenting in part.

¶74 The Court concludes that Dugan's statement did not constitute fighting words, is not punishable under the captive audience doctrine, is not a true threat, is not obscenity, and is "certainly not of high social value." Opinion, ¶¶ 43, 44, 47, 48. Although the Court may have established what Dugan's statement is not, I would like to discuss what it

is and call it for what it is. My conclusion is based upon and limited to the specific facts of this case, of one person speaking directly and individually to only one other person who was duty-bound to receive communication, with no other intended audience.

¶75 As alleged, Dugan's statement was a direct, individual, and personal attack upon Redmond-Sherrill. It was demeaning, degrading, and debasing. It included only words "which by their very utterance inflict injury." *Chaplinsky*, 315 U.S. at 572, 62 S. Ct. at 769. It bore "no essential part of any exposition of ideas." *Chaplinsky*, 315 U.S. at 572, 62 S. Ct. at 769. It was utterly without any social value whatsoever. It truly constitutes, as used here and in this context, "*no* part of the expression of ideas." *R. A. V.*, 505 U.S. at 385, 112 S. Ct. at 2544 (emphasis in original). It had only one purpose: to injure and abuse Redmond-Sherrill, to reduce her human dignity to nothing more than a sexual act or a sexual body part. "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." *Chaplinsky*, 315 U.S. at 572, 62 S. Ct. at 769.

¶76 The Court correctly notes that the Supreme Court offered a clarifying statement in *Stevens* about descriptions of speech it had used in previous cases. The Supreme Court stated that such descriptions were not generally applicable tests that "permit the Government to imprison any speaker so long as his speech is deemed valueless or unnecessary, or so long as an ad hoc calculus of costs and benefits tilts in a statute's favor." *Stevens*, ___ U.S. at ____, 130 S. Ct. at 1586. It is important to note, however, that *Stevens* was addressing something far different from the issue here. The federal

statute at issue in *Stevens* criminalized depictions of animal cruelty with such "alarming [definitional] breadth" that pictures of big game hunting could have been outlawed. *Stevens*, ___ U.S. at ____, 130 S. Ct. at 1588-89. The Government defended the challenge by offering the likewise incredibly broad argument that "depictions of animal cruelty, as a class, are categorically unprotected by the First Amendment." *Stevens*, ___ U.S. at ____, 130 S. Ct. at 1584. It was in response to the Government's unbridled argument, which the Supreme Court characterized as a new "free-floating" First Amendment test that was "startling and dangerous," *Stevens*, ___ U.S. at ____, 130 S. Ct. at 1585, that the Court distinguished some of its previous comments. However, in doing so, it did not overrule *Chaplinsky*, which it neither discussed nor directly quoted in this context, or any other previous case. *Stevens*, ___ U.S. at ____, 130 S. Ct. at 1585-86. Rather, it reaffirmed the concept that certain speech has been "historically unprotected," and noted that "'[i]t rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.'" *Stevens*, ___ U.S. at ____, 130 S. Ct. at 1586 (internal citation omitted).

¶77 It is unnecessary here to engage in the type of "ad hoc calculus of costs and benefits" offered by the Government in *Stevens*, which the Supreme Court rejected. There is no necessity of weighing Dugan's statement against "the social interest in order and morality," *Chaplinsky*, 315 U.S. at 572, 62 S. Ct. at 769, because under the facts of this case it holds no weight at all. On its face, the statement offered absolutely no social value, and no justification whatsoever can be offered for it. It communicated no thought

or expression to any audience or any person beyond Redmond-Sherrill, who was on the phone with Dugan pursuant to her public duty. The statement was, as alleged, intended to be personally injurious only to her. The right of free speech should not extend to Dugan's individually directed, personally debasing, and injurious statement to duty-bound Redmond-Sherrill that had no part of any exposition of ideas. *R. A. V.*, 505 U.S. at 385, 112 S. Ct. at 2544.

¶78 Dugan could have sought to verbally injure Redmond-Sherrill without using "obscene, lewd, or profane language," and he would not have violated the criminal statute. Section 45-8-213(1)(a), MCA. Or, he could have used these particular words without intending to injure Redmond-Sherrill, and he likewise would not be guilty of violating the statute. However, as alleged, if he used these words *and* intended to injure Redmond-Sherrill, then he used his speech "as an integral part of conduct in violation of a valid criminal statute," for which the Supreme Court has approved criminal sanction. *Stevens*, ___ U.S. at ____, 130 S. Ct. at 1586. Thus, Dugan's motion to dismiss was properly denied.

¶79 "The right to free speech is not absolute." *State v. Compas*, 1998 MT 140, ¶ 25, 290 Mont. 11, 964 P.2d 703. We have often quoted *Chaplinsky*, as quoted at Opinion, ¶ 18, as the basis that the First Amendment does not protect all speech. *See O'Shaughnessy*, 216 Mont. at 438, 704 P.2d at 1024; *Lance*, 222 Mont. at 102, 721 P.2d at 1265; *State v. Cooney*, 271 Mont. 42, 48, 894 P.2d 303, 307 (1995); *State v. Helfrich*, 277 Mont. 452, 460, 922 P.2d 1159, 1164 (1996); *Nye*, 283 Mont. at 512-13, 943 P.2d at 101; *Robinson*, ¶ 18. All 50 states, the District of Columbia, and the federal government

have some form of criminal statute prohibiting harassing or obscene communication through the telephone. Josh Tatum, First Amendment Center, *Telephone-harassment statutes*, http://www.firstamendmentcenter.org/telephone-harassment-statutes (accessed Jan. 25, 2013); American Law Institute, *Model Penal Code and Commentaries: Official Draft and Revised Comments*, § 250.4 cmts. at 360 (1980). In Montana, we have previously held that harassment and intimidation fall outside the protection of the First Amendment, independent from analyses examining whether the words were unprotected "fighting words," obscenity, or threats, or were made to a captive audience. *See e.g. Cooney*, 271 Mont. at 49, 894 P.2d at 307 ("free speech does not include the right to cause substantial emotional distress by harassment or intimidation."); *Nye*, 283 Mont. at 513, 943 P.2d at 101 ("[a]ctivities which are intended to embarrass, annoy or harass . . . are not protected by the First Amendment."). Further, the Montana Constitution provides that "[e]very person shall be free to speak or publish whatever he will on any subject, *being responsible for all abuse of that liberty*." Mont. Const. art. II, § 7 (emphasis added).

¶80 Dugan chose to speak in a manner that was as debasing, injurious, and abusive as can be spoken in our society, in a direct, personal, and individual attack on a public employee who was duty-bound to receive communications from Dugan. I would hold that Dugan's speech was integral in harassing Redmond-Sherrill, as "an activity illegal throughout the Nation," and is "a previously recognized, long-established category of unprotected speech" by this Court. *Stevens*, ___ U.S. at ____, 130 S. Ct. at 1586.

Dugan's words should be deemed unprotected speech and he should now be held "responsible for all abuse of that liberty." Mont. Const. art. II, § 7.

¶81 As to Issue 2, whether the statute is overbroad, the Court today strikes the prima facie language in § 45-8-213, MCA. However, a narrow application would be more appropriate where the prima facie evidence at issue is similar to other mental state requirements. To remedy the problem that a statute may not set forth a prima facie intent provision to conclusively prove the defendant's mental state, *see Black*, 538 U.S. at 366-67, 123 S. Ct. at 1551-52, I would construe the prima facie evidence sentence in § 45-8-213, MCA, as permissive rather than mandatory. This Court presumes that statutes enacted by the Legislature are constitutional and we "must adopt a construction of the statute which renders the statute constitutional in preference to one which renders it invalid." *Helfrich*, 277 Mont. at 454, 922 P.2d at 1160 (citations omitted).

¶82 In *Richards*, the Idaho Court of Appeals upheld Idaho's telephone harassment statute against a facial overbreadth challenge. *Richards*, 896 P.2d at 363. The court stated the defendant's overbreadth argument failed because the statute did "not prohibit the mere expression of ideas or information. Telephone calls made with a legitimate intent to communicate are not criminalized. Rather, the statute prohibits only telephone contacts made with a specific and exclusive intent to 'annoy, terrify, threaten, intimidate, harass or offend.'" *Richards*, 896 P.2d at 362.[1] The court said those being accused of

---

[1] Idaho's statute also includes a provision stating, "[t]he use of obscene, lewd or profane language or the making of a threat or obscene proposal, or the making of repeated anonymous telephone calls as set forth in this section may be prima facie evidence of intent to annoy, terrify, threaten, intimidate, harass or offend." Idaho Code § 18-6710(2) (2012).

violating the statute "must be shown to have formulated the specific harmful intent to annoy, terrify, threaten, intimidate, harass or offend in order to be guilty, they cannot be heard to complain that they did not understand the mental element of the crime." *Richards*, 896 P.2d at 365.

¶83    Likewise, instead of striking the language, I would construe the language of the prima facie evidence in § 45-8-213, MCA, as a permissive inference rather than as a mandatory presumption.  The state would need to prove that the defendant formulated the specific intent "to terrify, intimidate, threaten, harass, annoy, or offend" in order to be proven guilty.  This approach would follow our mandate to uphold legislative enactments while adopting an interpretation of the statute that is constitutional.

¶84    I concur in the Court's resolution of Issue 3.

¶85    I would affirm.

/S/ Jim Rice