No. 85-153

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

_____

CITY OF BILLINGS,

        Plaintiff and Respondent,

  -vs-

EARL BATTEN,

        Defendant and Appellant.

_____

APPEAL FROM:  District Court of the Thirteenth Judicial District,
                In and for the County of Yellowstone,
                The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Calton & Hamman; Frances M. Calton, Billings, Montana

    For Respondent:

        Bonnie Sutherland, Assistant City Attorney, Billings,
        Montana

_____

Submitted on Briefs:  June 28, 1985

Decided:  September 12, 1985

Filed:

_____
Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Defendant appeals his conviction for disorderly conduct, a violation of § 45-8-101, MCA, following jury trials in both the City Court of Billings and subsequently in the District Court of the Thirteenth Judicial District, Yellowstone County. He was fined $100 and assessed jury costs of $316. Claiming that § 45-8-101, MCA, is unconstitutional and that Billings failed to establish a prima facie case, the defendant appeals to this Court.

We affirm the judgment of the District Court holding that § 45-8-101, MCA, is constitutionally valid and that appellant's violation of that statute has been established by substantial evidence.

The following issues are raised on appeal:

1. Whether appellant's statements and conduct were protected by the Constitution.

2. Whether § 45-8-101, MCA, is void for vagueness and overbreadth.

3. Whether appellant's statements and conduct establish the necessary elements of disorderly conduct under § 45-8-101, MCA.

4. Whether the District Court erred in denying appellant's motion to dismiss for failure of the respondent to establish a prima facie case.

The testimony of the parties conflict. The following facts come primarily from the testimony of Joseph Carlson, his son, Mike Carlson, and his wife, Cathy Carlson.

Appellant Earl Batten was charged with the misdemeanor crime of disorderly conduct as a result of his actions on the night of April 21, 1984. On that date, Batten owned a

business named Rimrock Honda, which was located next to an open field. On the other side of the open field and across the street, approximately one-half block away, the Joseph Carlson family resides. The Dennis Gambill family lives next door to the Carlsons.

On the night of April 21, 1984, at approximately 8:30 p.m., the Carlsons sent their fifteen-year-old son, Steve, to Buttrey's food store for some milk. Buttrey's is located across the street, across the field, and on the other side of Batten's property from the Carlson residence. The open field and Batten's property were routinely used by pedestrians as a route from the residential area to Buttrey's and the other stores. As Steve left the house to go to Buttrey's, Joseph Carlson watched him from the front window. Although it was dark out, the area was illuminated by a sign on appellant's property. As Joseph Carlson watched his son walk toward Buttrey's, he noticed a person standing by a cluster of small trees near the route followed by Steve. As Steve started down a path across the field, the person by the trees started to follow the boy. This activity concerned Joseph and he called his wife, Cathy Carlson, to the window. She saw the figure of the person in the shadow of the trees. At that point, neither Joseph nor Cathy Carlson could identify the figure.

After seeing the figure follow his son, Joseph Carlson believed his son might be in danger. He therefore ran outside after picking up a golf club for protection and started after Steve. At that time his nineteen-year-old son, Mike Carlson, drove into their driveway. Mike Carlson joined his father, and both followed Steve to make sure that the unidentified figure would not harm the younger boy.

3

As Steve continued on the path, Cathy Carlson went outside onto the driveway. On her way out, she grabbed a pair of binoculars to help her see the confrontation.

It then appears that appellant stopped and waited for Joseph and Mike Carlson to overtake him. There ensued a verbal battle in which appellant ordered the Carlsons off his property. The Carlsons left appellant's property, but appellant continued his verbal attack calling Joseph Carlson a communist government worker, no good son-of-a-bitch, chickenshit, and m----------r. Appellant said, "Fight me. Hit me. You have a golf club. Come on. I want to fight you." Appellant's voice had become loud and he started laughing at the Carlsons. He continued to swear and challenge the Carlsons. Joseph Carlson testified to at least five people turning around and looking in their direction from an adjacent commercial parking lot.

Meanwhile, Cathy Carlson was observing the commotion from the Carlsons' front yard. She heard a loud "f--k you." Although she does not know who said that, she knows it was not her husband's or her son's voice. She could hear that particular language clearly, and it came from the area where appellant and her husband were. Cathy Carlson was afraid for her family and called their next-door neighbors, the Gambills. The Gambills came outside and testified to hearing the yelling and that it was loud, although they could not make out individual words.

Mike Carlson was angered by appellant's profanity and challenges and told his father he was going to hit appellant. Joseph grabbed Mike and told him to go and get his brother at Buttrey's instead. Mike followed his father's orders. Appellant continued to yell at Joseph. After three or four

4

minutes of this, Joseph attempted to walk home. He planned to get his car and drive over to Buttrey's to pick up his sons so that they would not have to confront appellant again. Appellant yelled after Joseph "come back and fight you m----------r. I want to get it over with." Joseph started to walk faster, and appellant started to follow him. Joseph then ran the rest of the way to his house. Joseph and Gambill then drove to Buttrey's to pick up the boys.

Just after Cathy Carlson called the Gambills, she called the police. Officer Keith Richard Buxbaum was dispatched to the Carlsons' residence in response to the call. When Officer Buxbaum arrived along with Officer Barta, the incident was over. The police searched the area for appellant but could not find him. Officer Buxbaum then requested a warrant for appellant for disorderly conduct in his report. Appellant was arrested on May 3, 1984.

Appellant was charged under § 45-8-101, MCA, which provides:

> Disorderly conduct. (1) A person commits the offense of disorderly conduct if he knowingly disturbs the peace by:
>
> (a) quarreling, challenging to fight, or fighting;
>
> (b) making loud or unusual noises;
>
> (c) using threatening, profane, or abusive language;
>
> . . .
>
> (2) A person convicted of the offense of disorderly conduct shall be fined not to exceed $100 or be imprisoned in the county jail for a term not to exceed 10 days, or both.

5

I

The first two issues presented by appellant concern his constitutional right of free speech and whether or not the statute is unconstitutionally vague and overbroad. This Court recently considered similar issues in City of Whitefish v. O'Shaughnessy (Mont. 1985), ___ P.2d ___, 42 St.Rep. 928. In that case we expressly declined to construe § 45-8-101, MCA, because appellant in that case was charged under a Whitefish municipal ordinance rather than the statute. However, O'Shaughnessy remains Montana's primary precedent concerning statutes or ordinances which seek to preserve the peace through regulation of loud, profane, and threatening speech. In this decision, we will consider the specific facts and construe § 45-8-101(1), MCA, in light of the principles we espoused in O'Shaughnessy.

In O'Shaughnessy we were presented with the following ordinance:

> Whitefish Municipal Ordinance, 9.64.010. No person within the municipality, or within three miles of the municipal limits, shall willfully and maliciously disturb the peace and quiet of any street, neighborhood, family, or person by loud, tumultuous noise, or by tumultuous or offensive conduct, or by using offensive, loud radio or television sets, or by threatening, quarreling, scolding, hallooing, hollering, challenging to fight, or fighting, or by cursing, swearing, uttering obscene, profane, vulgar, or indecent language in the presence of any person or persons, or by committing any obscene, vulgar, indecent, or lewd act in any public place, or in view of any person or persons.

The appellant's charge and conviction under this ordinance stemmed from his offensive statement to a police officer, that is, "Well, m----------r, I will holler and yell when and wherever I want to . . ." We upheld the conviction

holding that the jury properly found that appellant's speech constituted "fighting" words which are not protected by the Constitution, Chaplinsky v. New Hampshire (1942), 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, and by narrowly construing the ordinance as only applying to words that have a direct tendency to violence and which are willfully and maliciously uttered. Under this narrow construction Whitefish's ordinance is not unconstitutional for vagueness and overbreadth because it is only applicable to unprotected speech. See Gooding v. Wilson (1972), 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408.

As just discussed, "fighting words" are not constitutionally protected speech. The right of free speech is not absolute. Chaplinsky, 315 U.S. at 571. A state has the power constitutionally to punish "fighting words" under carefully drawn statutes not susceptible of application to protected expression. Gooding, 405 U.S. at 522.

In O'Shaughnessy we approved the following jury instructions regarding "fighting words":

> You are instructed that the words and language of the defendant must have been of such nature that men of common intelligence would understand would be words likely to cause an average person hearing such words to fight. Threatening, profane, and obscene words, said without a disarming smile, are generally considered to be "fighting words."

The appellant, by the City's version of the encounter, repeatedly called Carlson a number of profanities and a communist government worker, and also challenged him to fight. Appellant's language and conduct nearly provoked Mike Carlson to fight and so concerned Joseph Carlson that he ran from the confrontation. This Court holds that appellant's

7

speech and conduct constituted "fighting words" that are unprotected by the constitution.

Having thus determined that appellant's right to free speech did not entitle him to conduct himself as he did, we now turn to the statute to determine whether it is vague or overbroad and facially invalid. A statute may be held unconstitutional if it is vague and overbroad. 12 A.L.R.3d 1448. Vagueness and overbreadth are related concepts often spoken of together. A statute must be drawn with sufficient clarity and definiteness to inform persons of ordinary intelligence what actions are proscribed (vagueness) and it cannot be susceptible of reaching constitutionally protected activity (vagueness and overbreadth). In O'Shaughnessy we also discussed vagueness and overbreadth doctrine and concluded that invalidation of a potentially vague or overbroad statute can be avoided by a narrow construction of the statute. Statutes or ordinances regulating expressive conduct must be carefully drawn or authoritatively construed to punish only unprotected forms of speech. Wurtz v. Risley (9th Cir. 1983), 719 F.2d 1438. We therefore construed the Whitefish ordinance narrowly to apply only to words that have a direct tendency to violence and which are willfully and maliciously uttered.

The disputed portion of § 45-8-101, MCA, is very similar to the Whitefish ordinance we upheld in O'Shaughnessy. The only difference of any substance is that the ordinance requires the elements of willful and malicious whereas the statute substitutes "knowingly" for those intent elements. Such a substitution is explained by the fact that Montana's Penal Code revamped common law intent requirements and no longer utilizes terms like "willfully and malicious" but replaced such terms with "purposely" and "knowingly." 37

8

Mont.L.Rev. 401. If anything, the statute's utilization of the intent element of "knowingly" rather than "willfully and maliciously" makes the statute less vague than the ordinance because § 45-2-101(33), MCA, specifically defines "knowingly." Use of the intent element of "knowingly" does not render the statute unconstitutionally vague.

We now construe § 45-8-101(1), MCA, as only applying to words that have a direct tendency to violence and which are knowingly uttered. So construed, the statute is not unconstitutional on its face for vagueness or overbreadth.

## II

Appellant next alleges that his words and actions were not sufficient to support a charge of disorderly conduct. Appellant disputes what the jury chose to believe and alleges that the testimony could not establish the elements delineated in the statute under which he was charged. Specifically, appellant alleges that the elements of "disturbing the peace" and "using threatening, profane, or abusive language" were not established.

This Court will not substitute its judgment for that of the jury; a jury which, in this case, was able to view first-hand the evidence presented, observe the demeanor of the witnesses and weigh the credibility of each party. The facts stated at the outset of this opinion are sufficient to support the verdict of the jury. We hold that those facts are sufficient to establish the elements of disorderly conduct as enumerated in § 45-8-101, MCA.

Appellant questions whether his behavior could constitute "disturbing the peace" under the statute. He quotes the Criminal Law Commission Comments under § 45-8-101, MCA, which

9

require that in order for conduct to disturb the peace, the behavior must disturb "others" and that it is not sufficient that a single person or a very few persons have grounds for complaint. Appellant argues that there were not sufficient people present to constitute "others" and that therefore he could not have disturbed the peace.

Although we have never decided how many people must be disturbed before the peace is disturbed, one Montana case involving the crime of breach of the peace, former § 94-4560, R.C.M. 1947, provides guidance. In State v. Turley (1974), 164 Mont. 231, 521 P.2d 690, Turley's conviction for disturbing the peace was upheld. Section 94-3560, R.C.M. 1947, prohibited disturbances of the peace by "loud or unusual noise or tumultuous, or offensive conduct or threatening, quarrelling, challenging to fight or fighting." Turley was convicted under this statute when only he, his wife, and a third party were present to witness his conduct.

In the instant case, not only did appellant directly confront and threaten Joseph and Mike Carlson by calling them names, using profanity, threatening and trying to get them to fight him, but the commotion initiated by appellant also drew the attention of more persons. The neighbors of the Carlsons and Cathy Carlson could hear the appellant's yelling from a half block away. Cathy Carlson heard appellant yell "f--k you" at her husband and son. At least five people in the Buttrey's parking lot turned around and looked in the direction of the commotion. We hold that sufficient people were disturbed by appellant's conduct to constitute a disturbance of the peace.

The next element which appellant argues has not been sufficiently proven to support his conviction is his use of

"threatening, profane, or abusive language." In this opinion we have already construed this element as applying only to words that have a direct tendency to violence. We hold that appellant's conduct and speech as outlined earlier in this opinion were sufficiently offensive as to provoke violence in others. Any reasonable man would be outraged by appellant's conduct.

## III

Finally, appellant argues that the trial court committed reversible error in denying his motion to dismiss for failure of plaintiff to establish a prima facie case. Since we have held that a prima facie case was established, there is no need to deal with this contention further.

The judgment is affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

11