FILED

07/08/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0180

DA 23-0180

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 143

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

DOUGLAS BAERTSCH,

      Defendant and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC 2020-317
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Tammy A. Hinderman, Appellate Defender Division Administrator,
Kathryn Grear Hutchison, Assistant Appellate Defender, Helena,
Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant
Attorney General, Helena, Montana

            Kevin Downs, Lewis and Clark County Attorney, Jessica Best,
Deputy County Attorney, Helena, Montana

                  Submitted on Briefs:  April 23, 2025

                        Decided:  July 8, 2025

Filed:

                        _____
                                Clerk

Justice Katherine Bidegaray delivered the Opinion of the Court.

¶1 Douglas Baertsch appeals his January 2023 conviction and sentence in the Montana First Judicial District Court, Lewis and Clark County. We address the following restated issues:

1. *Did sufficient evidence support the Defendant's conviction on the offense of burglary with "disorderly conduct" as the predicate offense?*

2. *Did the District Court impose an illegal sentencing condition restricting the Defendant's right to seek early termination of his sentence?*

Baertsch also asserts that his trial counsel was constitutionally ineffective. We hold that Baertsch's burglary conviction was not supported by sufficient evidence, vacate that conviction, and therefore do not reach Baertsch's ineffective assistance of counsel claim.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 On May 21, 2020, Baertsch and his girlfriend, K.W., went out to dinner in Marysville, Montana. At dinner, K.W. raised the topic of ending their relationship. Both had drinks during dinner and stopped at a bar on the way home for more drinks. While at the bar, Baertsch and K.W. argued over alleged infidelity. They continued to argue on the way home.

¶3 Upon returning to K.W.'s home in Helena, the arguing escalated. While K.W. sat in a chair charging her phone, Baertsch demanded to see the phone. When K.W. refused, Baertsch picked her up by her jacket, forcibly removed the phone from her hand, and tossed her onto the couch, cutting her thumb. K.W. told Baertsch to get his belongings and leave immediately.

2

¶4　K.W. left her house with her dog, expecting Baertsch would gather his things and be gone by the time she returned. She drove to her brother's house approximately two miles away but returned home after discovering he was not there. When she returned, Baertsch's vehicle was gone. As K.W. entered her front door, she saw headlights in her driveway and recognized Baertsch's vehicle, so she locked the front door. Baertsch approached the house, rang the bell, and yelled for K.W. to open the door and return his wallet, which he said he had left inside.

¶5　K.W. discovered Baertsch's wallet under the blankets in her bed. She went to the front door, opened it, and threw the wallet outside. A brief clip of K.W.'s doorbell camera video played at trial showed K.W. standing on the porch yelling to Baertsch that his wallet was in the front yard and then re-entering the house. The camera recorded Baertsch, who was walking around the front yard searching the ground with a light, yell, "Where?! You fucking puke!" Seconds later, Baertsch ran up to the front door and kicked it in with one kick, breaking the door jamb. He stepped inside the house, immediately stepped back out onto the porch, and then ran into the yard to grab his wallet, yelling, "I fucking hate you!"

¶6　K.W. later testified that, once Baertsch kicked in the front door,

> he ran in and then went out to grab his wallet. And then he came back in, and he was hugging me and telling me how much he loved me and that he was sorry. And then I was on the phone with the cops, and then he said, "you called the cops, you stupid bitch." And then he freaked out, and he ran in my house again and then drove off.

On redirect, K.W. added that, while Baertsch was hugging her, she told him, "I'm calling the police, my brother's on the way," and then, "instead of loving me," Baertsch "called

3

me a dumb cunt."[1]  When asked if Baertsch said "anything else after that," K.W. answered that he "[j]ust basically took off" and "ran out."

¶7    The State charged Baertsch with Partner or Family Member Assault (PFMA) (§ 45-5-206(1)(c), MCA); Criminal Mischief (§ 45-6-101(1)(a), MCA); and Burglary (§ 45-6-204(1)(b), MCA).  Later, the State amended the Information which alleged, in pertinent part, that Baertsch committed Burglary/Disorderly Conduct when he "knowingly entered or remained unlawfully in an occupied structure and knowingly or purposely committed the offense of . . . Disorderly Conduct/disturb[ing] the peace therein by using threatening, profane, or abusive language."[2]

¶8    At trial, K.W. admitted that Baertsch stayed in her Helena home occasionally but denied that he lived there.  Though she previously gave Baertsch the key code number for her front door for access while working on odd jobs around her home, K.W. had changed the code by May 2020.  K.W. testified consistently with her prior statements.

¶9    Baertsch testified in his defense, telling a very different version of events.  After K.W. kicked him out of her house, Baertsch was on the way home and realized he forgot his wallet and work keys.  He returned to K.W.'s house and tried to get her to let him in, but all the doors were locked.  When he could not get in, Baertsch went back to his truck.

---

[1] On direct examination, K.W. testified that Baertsch called her a "stupid bitch"; on redirect, she testified that he called her a "dumb cunt."  Because of the conflicting testimony, we assume he called her one or the other.

[2] *See* § 45-8-101(1)(a)(iii), MCA (2019).  The amended Information alleged two identical counts of Burglary/Disorderly Conduct.  At the beginning of trial, the District Court dismissed one of the counts as duplicative on the State's motion.  The amended Information also alleged a separate count of Burglary with Criminal Mischief as the predicate offense, but that charge is not at issue on appeal.

4

Then, he heard K.W. "open the front door and slam it," so he returned to the front porch. He was "really upset" that K.W. would not give him his wallet, so he kicked in the front door, which he admitted was "really dumb." Once inside, Baertsch grabbed his work keys and told K.W. he was sorry. When K.W. asked Baertsch to stay and fix the door, he answered, "absolutely not" and left. On cross-examination, the State highlighted numerous inconsistencies between Baertsch's testimony and prior statements.

¶10 During closing argument, the State explained the Burglary/Disorderly Conduct charge to the jury:

> [Baertsch] knowingly entered or remained unlawfully in the house, and he purposely or knowingly committed—and this, again, is a separate offense, disorderly conduct.
>
> I'm going to show you what the definition of that is. . . . [A person] [c]ommits the offense of disorderly conduct if the person knowingly disturbs the peace by using threatening, profane, or abusive language. And you heard it. As he's inside that house, I fucking hate you [K.W.][3] And he calls her every name under the sun. It's terrible. That was disturbing the peace. She's scared to death. He's in her house screaming at her.
>
> Now, also note after he boots down that door . . . [K.W.] testified that he left and then came back in and gave her a hug and said I love you. She said, I called the cops and my brother. And he said, you fucking call the cops, you cunt. Could you imagine? . . . So, folks, that's disorderly conduct. That's burglary. He entered that house. . . . He knew he wasn't supposed to be there. He boots down the door because he's pissed. He's screaming at her.

¶11 The jury returned guilty verdicts for: (1) Criminal Mischief, based on Baertsch's destroying K.W.'s front door when he kicked it in; (2) PFMA, based on Baertsch's yelling

---

[3] The doorbell camera footage shows Baertsch yelling, "I fucking hate you!" as he exits K.W.'s house, steps onto the porch, and runs back to the front yard, so the prosecutor's claim that Baertsch said this "inside that house" mischaracterizes the evidence. K.W. never testified that Baertsch said those words within the house, and the State does not argue on appeal that he did.

5

at K.W. from the porch, kicking in the front door, and causing a reasonable apprehension of bodily injury;[4] and (3) Burglary/Disorderly Conduct, based on Baertsch's disturbing the peace once inside K.W.'s house by using "threatening, profane, or abusive language." The District Court sentenced Baertsch to two consecutive five-year suspended prison terms for PFMA and Burglary, and six months jail-time (all but 60 days suspended) for Criminal Mischief. The court further imposed a seven-year restriction on Baertsch's ability to seek early termination of his sentence. Baertsch appeals the burglary conviction and sentencing restriction.

¶12 Although the record contains extensive evidence of Baertsch's aggressive and offensive conduct on the night of May 21, 2020, including his profane shouting outside and prior to his violent entry into K.W.'s home, our inquiry focuses narrowly on the evidence of disorderly conduct specifically within K.W.'s home, as required by the pertinent statute and instructed and argued to the jury.

## STANDARD OF REVIEW

¶13 Whether sufficient evidence supports a criminal conviction is a question of law we review de novo. *City of Bozeman v. McCarthy*, 2019 MT 209, ¶ 12, 397 Mont. 134, 447 P.3d 1048 (citing *State v. Colburn*, 2016 MT 246, ¶ 7, 385 Mont. 100, 386 P.3d 561). Whether a criminal sentence or sentencing condition is illegal or exceeds statutory

---

[4] The jury found Baertsch not guilty of the separate PFMA charge based on his picking K.W. up by her jacket, tossing her onto the couch, and cutting her thumb during the altercation *before* K.W. kicked him out of the house.

6

authorization is a question of law also reviewed de novo. *State v. Brady*, 2025 MT 105, ¶ 14, 422 Mont. 23, 569 P.3d 195.

## DISCUSSION

¶14    *1. Did sufficient evidence support the Defendant's conviction on the offense of burglary with "disorderly conduct" as the predicate offense?*

¶15    Baertsch contends there was not sufficient evidence to support his conviction for burglary because the State did not prove he committed the predicate disorderly conduct offense.[5]  Baertsch contends he could not have been found guilty of disorderly conduct because he did not breach the public peace while inside K.W.'s private home in only her presence.  The State counters that Baertsch's language and conduct satisfied the elements of § 45-8-101, MCA, and that neither the statute nor this Court's case law requires an offender to disturb the peace of more than one person.

¶16    Constitutional due process requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *State v. Craft*, 2023 MT 129, ¶ 19, 413 Mont. 1, 532 P.3d 461 (citing *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970)).  A criminal conviction is supported by sufficient evidence if, when viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all essential elements of the crime proved beyond a reasonable doubt. *State v. Rodriguez*, 2024 MT 132, ¶ 10, 417 Mont. 52, 551 P.3d 292.  Where the evidence is

---

[5] Baertsch does not dispute that he knowingly and unlawfully entered K.W.'s home when he kicked in her front door.

7

insufficient to support a conviction, the remedy is acquittal. *Craft*, ¶ 20 (citing *State v. Polak*, 2018 MT 174, ¶ 35, 392 Mont. 90, 422 P.3d 112).

### 1. Threshold Requirement: Predicate Offense Must Occur Within the Occupied Structure.

¶17 The specific way the State charged the burglary at issue here was under § 45-6-204(1)(b), MCA. Under this theory, a person commits burglary if the person (1) "knowingly enters or remains unlawfully in an occupied structure" and (2) "knowingly or purposely commits any other offense within that structure." Section 45-6-204(1)(b), MCA. The "other offense" underlying this burglary was disorderly conduct in violation of § 45-8-101(1)(a)(iii), MCA. A person commits this variant of disorderly conduct if the person (1) "knowingly disturbs the peace" (2) "by using threatening, profane, or abusive language." Section 45-8-101(1)(a)(iii), MCA (2019) (today, § 45-8-101(1)(c), MCA). Under a § 45-6-204(1)(b), MCA, theory of burglary, the State must prove the elements of burglary and the elements of the predicate offense. *State v. Tellegen*, 2013 MT 337, ¶¶ 24-25, 372 Mont. 454, 314 P.3d 902; *accord State v. Stokes*, 2024 MT 32, ¶ 6, 415 Mont. 208, 543 P.3d 601 ("[w]hen a second offense is charged as a predicate to a principal charge, the accused cannot be convicted of the principal charge without having committed the predicate offense").[6] This includes proving that the predicate offense occurred "within" the "occupied structure." *See Tellegen*, ¶¶ 24-25 (§ 45-6-204(1)(b), MCA, "requires the State to prove that another offense took place once inside the dwelling"); *Rodriguez*,

---

[6] Conversely, a § 45-6-204(1)(a), MCA, "intent theory" of burglary does not require proof of a predicate offense. *Rodriguez*, ¶ 29 (citing *Tellegen*, ¶¶ 24-26).

¶¶ 12-24, 31-32 (State had to prove that predicate assault offense to aggravated burglary conviction occurred "inside the house"; "an assault occurring outside the home could not have served as a predicate offense for a charge of aggravated burglary"). Accordingly, the State had to prove beyond a reasonable doubt that Baertsch knowingly and unlawfully entered K.W.'s home and, while "within" it, knowingly disturbed the peace by using threatening, profane, or abusive language.[7] We address these elements in turn.

### 2. Whether the Language was Threatening, Profane, or Abusive.

¶18    As a threshold matter, the offense of burglary "occurs at the time of unlawful entrance upon the premises." *State v. Wells*, 202 Mont. 337, 353, 651 P.2d 381, 389 (1983); *State v. Solis*, 163 Mont. 293, 295, 516 P.2d 1157, 1158 (1973). Baertsch's language and conduct any time prior to his unlawful entry into K.W.'s home through the kicked-in front door could not form the basis for the burglary/disorderly conduct offense as charged, instructed, and argued to the jury. Instead, only Baertsch's language and conduct after he kicked in K.W.'s front door and while inside her house could be used as the *predicate* for the burglary offense.[8] *See Rodriguez*, ¶¶ 12-24, 31-32; *Tellegen*, ¶¶ 24-25. *Accord State*

---

[7] In fact, this is exactly how the District Court instructed Baertsch's jury. *See* Jury Instruction No. 22 ("a person commits the offense of Burglary if the person knowingly enters or remains unlawfully in an occupied structure and knowingly or purposely commits any offense *in the occupied structure*"); No. 24 ("to convict the Defendant of Count IV Burglary, the State must prove the following elements: (1) that the Defendant knowingly entered or remained unlawfully within an occupied structure; and (2) that the Defendant knowingly or purposely *committed the offense of Disorderly Conduct in the occupied structure*"); Nos. 28-29 ("to convict the Defendant of Disorderly Conduct, the State must prove the following elements: (1) that the Defendant *disturbed the peace*; (2) by using *threatening*, *profane*, or *abusive* language; and (3) that the Defendant acted knowingly") (emphasis added).

[8] The State agrees, framing the issue on appeal as "[w]hether, *after* kicking in the victim's front door to gain access to her residence, there was sufficient evidence to convict Appellant of burglary

*v. Brandt*, 2020 MT 79, ¶ 17, 399 Mont. 415, 460 P.3d 427 ("[t]he State has broad discretion in determining . . . what crime to charge" and this Court is "bound by the State's choice in framing the charges" (citations omitted)). Based on K.W.'s trial testimony and the State's argument on appeal, that specific language was Baertsch's calling K.W. a "stupid bitch" or "dumb cunt" within K.W.'s house.

¶19 To ascertain whether a defendant's statements constitute "threatening, profane, or abusive language" punishable under § 45-8-101, MCA, we consider the defendant's language "within the common understanding of those terms." *Columbia Falls v. Bennett*, 247 Mont. 298, 299-300, 806 P.2d 25, 25-27 (1991). In *Bennett*, the defendant's telling a tow-truck driver "he was a 'son of a bitch' and a 'bastard'" and that he "was going to 'put a stop to'" him towing the car, and telling a responding police officer, "You're fucking out of line. You've done it this time, you're fucked," constituted "profane and abusive language" under § 45-8-101, MCA. In *State v. Felando*, 248 Mont. 144, 150-51, 810 P.2d 289, 292-93 (1991), the defendant's public display of "signs, made of paper plates, which displayed powerful profanity, derogatory language, and other unneighborly expletives all directed at" his neighbor and "meant as a warning to stop her from trespassing" was sufficient evidence of "threatening, profane, or abusive language" to support a disorderly conduct conviction. In *State v. Granby*, 283 Mont. 193, 199-200, 939 P.2d 1006, 1010 (1997), the defendant's asking his ex-wife, "did you get enough dick today?" and "gestur[ing] toward her as if he were masturbating" while they argued outside her house

_____

for committing disorderly conduct *within the residence*, based upon Appellant calling the victim a 'stupid bitch' or 'dumb cunt.'" Appellee's Response Brief, pp. 1, 20 (emphasis added).

10

was sufficient evidence of disorderly conduct. In *State v. Ashmore*, 2008 MT 14, ¶¶ 2-4, 22-23, 341 Mont. 131, 176 P.3d 1022, the defendant's directing words like "fucking" and "cocksucker" to police officers who stopped her vehicle satisfied the "threatening, profane, or abusive language" requirement of § 45-8-101, MCA.[9]

¶20　　As in *Bennett*, *Felando*, *Granby*, and *Ashmore*, we consider whether Baertsch's language was "threatening, profane, or abusive," within the common understanding of those terms. We conclude that a rational juror could find beyond a reasonable doubt that "stupid bitch" or "dumb cunt" constitute "profane" or "abusive" language, as those terms are commonly understood. *See Webster's Third New International Dictionary, Unabridged* (2021) ("profane" means abusive language, cursing, or an insulting or perverted utterance; and "abusive" means harsh, insulting language); *compare*

---

[9] In cases where a defendant challenges a disorderly conduct conviction for "threatening, profane, or abusive language" on constitutional grounds, i.e., by asserting that his language was constitutionally protected speech exempt from criminal liability, we have construed § 45-8-101, MCA, narrowly to apply only to "fighting words." *See Billings v. Batten*, 218 Mont. 64, 69-70, 705 P.2d 1120, 1123-25 (1985) (defendant's calling his neighbor a "communist government worker, no good son-of-a-bitch, chickenshit, and motherfucker" and saying, "Fight me. Hit me. You have a golf club. Come on. I want to fight you," was unprotected "fighting words"); *State v. Nelson*, 2014 MT 98, ¶¶ 23-24, 374 Mont. 444, 322 P.3d 1039 (defendant's calling her 13-year-old neighbor a "spic bastard" was unprotected "fighting words"); *State v. Robinson*, 2003 MT 364, ¶¶ 8-12, 15-24, 319 Mont. 82, 82 P.3d 27 (defendant's calling a police officer a "fucking pig" was unprotected "fighting words"). When a defendant, like Baertsch, does not raise the constitutional issue, we do not apply the narrower constitutional construction and instead, "simply analyze[] whether the [defendant's] language and conduct constituted 'threatening, profane, or abusive language' in violation of the disorderly conduct statute as written." *Granby*, 283 Mont. at 199-200, 939 P.2d at 1010 (citing *Bennett*, 247 Mont. at 299-301, 806 P.2d at 26-27); *accord Felando*, 248 Mont. at 150-51, 810 P.2d at 292-93; *Ashmore*, ¶¶ 2-4, 22-23.

11

*Threatening*, *Webster's* (intention to inflict damage or harm on another).[10] However, profane and abusive language is punishable under § 45-8-101, MCA, only if its use "disturbs the peace." Accordingly, we now turn to whether Baertsch knowingly disturbed the peace when he called K.W. a "stupid bitch" or "dumb cunt."

### 3. Whether the Language Disturbed the *Public* Peace.

¶21 Whether a person's conduct "disturbs the peace" will vary based on the particular facts and circumstances. *State v. Compas*, 1998 MT 140, ¶¶ 17, 24, 290 Mont. 11, 964 P.2d 703 (citing § 45-8-101, MCA, Commission Comments ("[t]he intent of [§ 45-8-101] is to use somewhat broad, general terms to establish a foundation for the [disorderly conduct] offense and leave the application to the facts of a particular case")); *accord Kleinsasser v. State*, 2002 MT 36, ¶¶ 18-20, 308 Mont. 325, 42 P.3d 801 (the circumstances of the offending act "play a large part in whether or not it [is] illegal" (citing § 45-8-101, MCA, Commission Comments)). When a defendant's conduct "falls under the proscriptions set forth in the acts enumerated" in the disorderly conduct statute, "the only question is whether these proscribed actions . . . could be found by a trier of fact to 'disturb the peace,' and thus give rise to a violation of § 45-8-101, MCA." *Compas*, ¶¶ 23-24.

¶22 The State contends that disturbing the peace of just one person is punishable under § 45-8-101, MCA. Our case law supports the State's position. In *Ashmore*, ¶¶ 2-4, the defendant was convicted of disorderly conduct for angry and belligerent behavior during a

---

[10] *Accord State v. Dugan*, 2013 MT 38, ¶ 72, 369 Mont. 39, 303 P.3d 755 ("fucking" when paired with "cunt" could qualify as "obscene, lewd, or profane" language under § 45-8-213, MCA, "under any reasonable definition of th[ose] terms").

12

traffic stop, including throwing her license and registration at the officer and "shower[ing] [him] with expletives." On appeal, she argued disorderly conduct requires "behavior that disturbs a number of people" and the State failed to prove that any witnesses—other than the two officers involved—observed her behavior. *Ashmore*, ¶ 9. Noting the "disparity" between the Commission Comments[11] and the plain language of § 45-8-101, MCA, we endeavored to answer, "whether it is possible to 'disturb the peace' by specific acts that affect only one, or a few persons, or whether greater numbers of persons must be affected by the enumerated acts before a violation of the statute can take place." *Ashmore*, ¶ 14. Surveying our case law,[12] we noted that we "never adopted a strict numerical requirement respecting how many people need be affected by conduct before it 'disturbs the peace.'" *Ashmore*, ¶¶ 15-16. We held that, "[w]hile the number of individuals affected by the conduct may play a role in whether the peace has been disturbed, it is not necessarily a dispositive factor." *Ashmore*, ¶ 17. Instead, the analysis turns on "the facts of a particular case." *Ashmore*, ¶¶ 17-24.

¶23 Later, in *State v. Nelson*, 2014 MT 98, ¶¶ 9-10, 374 Mont. 444, 322 P.3d 1039, the defendant was convicted of disorderly conduct for yelling a racial slur from her car at a 13-year-old boy walking along a public street as she drove by. She appealed, arguing the State presented no evidence that anyone other than the young boy "heard the remarks or

---

[11] "[T]he behavior must disturb 'others'" and "[i]t is not sufficient that a single person or a very few persons have grounds for complaint." *Ashmore*, ¶ 12.

[12] *Batten*, 218 Mont. at 71-72, 705 P.2d at 1125 (citing *State v. Turley*, 164 Mont. 231, 521 P.2d 690 (1974)); *State v. Lowery*, 233 Mont. 96, 100, 759 P.2d 158, 160 (1988).

witnessed the incident" and she could not be convicted of disturbing the peace "of only one person." *Nelson*, ¶¶ 14, 18.[13]  Applying *Ashmore*, we affirmed, holding that "[t]he disorderly conduct statute does not require evidence that more than one person was disturbed." *Nelson*, ¶¶ 17-20 (citing *Ashmore*, ¶¶ 12-13).  It was enough that the defendant's use of "threatening, abusive, or profane language"—a racial slur—occurred "on a public street," in public view, and had the potential to incite a breach of the peace. *Nelson*, ¶ 24.[14]

¶24    Notwithstanding the State's argument, Baertsch contends that he could not disturb the "public" peace inside K.W.'s private home.  We agree.  Even where a single person is the direct recipient of profane or abusive language, disorderly conduct requires a disturbance that is public in character or impact.  This is because disorderly conduct is and has historically been an offense against the *public* order.  *See Cantwell v. Conn.*, 310 U.S. 296, 308, 60 S. Ct. 900, 905 (1940) ("the offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility"); *Commonwealth v. Greene*, 189 A.2d 141, 144 (Penn. 1963) ("[t]he cardinal feature of the crime of disorderly conduct is public unruliness which can or does lead to tumult and disorder").[15]  "Disturbing the peace," synonymous with "breaching the peace," is defined

---

[13] Like the defendant in *Ashmore*, the defendant in *Nelson* also relied on the Commission Comments to § 45-8-101, MCA.

[14] *Nelson* also involved a separate analysis to address the defendant's contention that her use of the racial slur was constitutionally protected "fighting words."  *Nelson*, ¶¶ 22-24.

[15] *Accord*, *e.g.*, Model Penal Code Section 250.2 ("a person is guilty of disorderly conduct" who acts "with purpose to cause public inconvenience, annoyance or alarm"; "'public' means affecting or likely to affect persons in a place to which the public or a substantial group has access");

as "a disturbance of *public* order and tranquility by acts or conduct not merely amounting to unlawfulness, but tending to create *public* tumult and incite others to break the peace." *State v. Ytterdahl*, 222 Mont. 258, 261, 721 P.2d 757, 759 (1986) (citing 12 Am. Jur. 2d 666, § 4, and Restatement (Second) of Torts, § 116 ("a breach of the peace is a public offense done by violence, *or* one causing or likely to cause an immediate disturbance of *public* order") (emphasis added)).[16]

¶25     Moreover, while § 45-8-101, MCA, criminalizes certain language that disturbs the peace, its application must conform to constitutional free speech protections. Construing "disturbs the peace" to require a public component—i.e., language that either incites or risks inciting disruption to the broader community—avoids impermissibly criminalizing

---

§ 45-8-101, MCA, Commission Comments (disorderly conduct offense "directed at curtailing that kind of behavior which disrupts and disturbs the peace and quiet of the community by various kinds of annoyances").

[16] In *Compas*, we unnecessarily limited application of the *Ytterdahl* definition of "disturbing the peace" to disorderly conduct under § 45-8-101(1)(g), MCA (1985) ("disturbing or disrupting any lawful assembly or public meeting"). There, in rejecting Compas's contention that her repeatedly honking a car horn while driving the entire length of highway adjacent to an RV campground could not disturb the peace "as we defined that term in *Ytterdahl*," this Court stated that we defined "disturbing the peace" in *Ytterdahl* only "for purposes of" the -101(1)(g) disorderly conduct variant. *Compas*, ¶¶ 15-16 (stating that "we expressly limited application of *Ytterdahl* to disorderly conduct charges brought under 45-8-101(1)(g), MCA, in *State v. Lowery*"). However, in *Lowery*, we did not limit *Ytterdahl* and, instead, distinguished it. *Lowery*, 233 Mont. at 98-99, 759 P.2d at 159-60 (noting both that Lowery was charged under a different variant of disorderly conduct than Ytterdahl ("quarreling, challenging to fight, or fighting") *and* that Lowery's physically resisting being forcibly removed by police from a town hall meeting was not analogous to Ytterdahl's protected exercise of free speech). We affirmed Compas's conviction where the evidence established "the horn honkings caused an immediate disturbance to the [campground owners] and their guests and thereby disturbed their peace." *Compas*, ¶¶ 18-19. This holding does not conflict with the "disturbing the peace" definition articulated in *Ytterdahl*, i.e., "a disturbance of public order and tranquility . . . tending to create public tumult." We therefore overrule the portion of *Compas* stating the *Ytterdahl* definition of "disturbing the peace" applies only to the variant of disorderly conduct punishing "disturbing or disrupting any lawful assembly or public meeting."

15

private, domestic communications. That construction also aligns with the longstanding view of disorderly conduct as an offense against the *public* order, as the following cases show.

¶26 Regarding the "threatening, profane, or abusive language" variant of disorderly conduct, in *Batten*, where the defendant directed threats and profanity at his neighbor and the neighbor's children, onlookers "turned around" to observe the altercation, and the neighbor's wife and other neighbors came outside to investigate the yelling, we held that the defendant caused a neighborhood "commotion" sufficient to satisfy the disturbing the peace element of § 45-8-101, MCA. *Batten*, 218 Mont. at 71-72, 705 P.2d at 1125. In *Bennett*, the defendant's "loudly protesting" the towing of a vehicle outside his bar by cussing at the tow-truck driver and police officer "caused a crowd to form and caused people to stop other business and observe the confrontation"; this was sufficient to disturb the peace. *Bennett*, 247 Mont. at 301, 806 P.2d at 27. In *Felando*, the defendant's display of signs showing "powerful profanity" directed at his neighbor and meant as a menacing warning to stop trespassing was sufficient evidence of disturbing the peace. *Felando*, 248 Mont. at 150-51, 810 P.2d at 292-93. In *Granby*, the defendant disturbed the peace when he argued with his ex-wife in her front yard with her two children present while his friend had to "break up the fight" and "haul [him] away." *Granby*, 283 Mont. at 195, 200, 939 P.2d at 1007, 1010. In *Ashmore*, ¶¶ 3-4, 22-24, when pulled over by police for speeding and honking her horn as she drove past a traffic stop, the defendant threw her identifying documents at police and called the officer a "cocksucker"; this was sufficient evidence to establish that she disturbed the peace under § 45-8-101, MCA. Finally, in

16

*Nelson*, ¶¶ 9, 20, sufficient evidence supported a disorderly conduct conviction where the defendant and her companion "direct[ed] profane and abusive language toward" their 13-year-old neighbor "from their vehicle" as he was walked home from school along "a public street."

¶27 Regarding other variants of disorderly conduct, in *State v. Lowery*, 233 Mont. 96, 98-100, 759 P.2d 158, 159-60 (1988), the defendant's physically resisting removal by law enforcement from a town council meeting, which resulted in a "scuffle" and a broken chair, was sufficient to disturb the peace under § 45-8-101(1)(a), MCA (1987) ("knowingly disturb[ing] the peace by quarreling, challenging to fight, or fighting"). In *State v. Turley*, 164 Mont. 231, 521 P.2d 690 (1974), while the defendant and his wife were parked at their airport hangar, the airport manager drove by. After exchanging some unfriendly words, the defendant unholstered his gun, pointed it at the airport manager, threatened to shoot him, and then chased after his car and spit on it as he drove away. This conduct was sufficient to disturb the peace under § 94-3560, RCM (1947) (1973) (precursor to § 45-8-101, MCA). *Turley*, 164 Mont. at 232-34, 521 P.2d at 690-92. Finally, in *Compas*, ¶¶ 11, 14-19, 26, the defendant's repeatedly honking her horn while driving down the highway for the entire length of an adjacent RV campground was intended to annoy and harass campground owners and guests, and therefore was sufficient to disturb the peace under § 45-8-101(1)(b), MCA (1997) ("knowingly disturb[ing] the peace . . . by making loud or unusual noises").

¶28 By comparison, in *Ytterdahl*, 222 Mont. at 260-62, 721 P.2d at 759-60, the defendant's "hollering and screaming" at county commissioners during a commissioners'

17

meeting, abruptly storming out, and slamming the door was not sufficient to "disturb the peace" under § 45-8-101(1)(g), MCA (1985) ("knowingly disturb[ing] the peace by disturbing or disrupting any lawful assembly or public meeting"), because it did not "tend[] to create public tumult," "incite others to break the peace," or "cause[] an immediate disturbance by others." And, in *Kleinsasser*, ¶¶ 3-4, 15, we held that police officers illegally stopped a vehicle after observing the defendant urinating on the side of the roadway because they lacked particularized suspicion that the defendant had committed disorderly conduct under § 45-8-101(1)(i), MCA (2001) ("knowingly disturb[ing] the peace by creating a hazardous or physically offensive condition by any act that serves no legitimate purpose"). The elements of the statute could not be met by the defendant's simply urinating "in the dark of night" alongside a "rural" and largely empty roadway, which "disturbed" only the officers, who were themselves not even disturbed enough to issue a citation. *Kleinsasser*, ¶¶ 15-21.

¶29 All the disorderly conduct cases discussed here involved conduct and language occurring either outside in public view or inside a public building. The State has not identified and we cannot find a single case where we upheld, or even reviewed, a conviction for disorderly conduct for use of "threatening, profane, or abusive language" inside a *private home*.

¶30 The gravamen of these cases is that the "disturbs the peace" element of disorderly conduct, regardless of the specific variant at issue, requires an actual disturbance of, or potential to disturb, the *public* order. *Ytterdahl*, 222 Mont. at 261, 721 P.2d at 759 (disorderly conduct offense is meant to punish conduct "tending to create *public* tumult

18

and incite others to break the peace" (emphasis added)). To secure constitutional free speech protections inherently implicated by criminalizing "threatening, profane, or abusive language," we must construe the "disturbs the peace" element of the subject disorderly conduct offense to include disturbing only the *public* peace.[17] To constitute a criminal disturbance under § 45-8-101, MCA, the offensive language must disrupt, or have a realistic potential to disrupt, the public order.[18] A purely private dispute, confined to a private residence and not calculated to provoke external unrest, does not suffice. Language uttered in a private home, directed at one person, that does not disrupt the public order or have the potential to spill out into and disturb the public sphere falls outside the scope of § 45-8-101(1)(a)(iii), MCA (2019) (today, § 45-8-101(1)(c), MCA).[19]

¶31 Limiting our analysis strictly to what occurred after Baertsch kicked in K.W.'s front door and unlawfully entered her home, as required by the variant of burglary charged here, K.W. testified that, after Baertsch called her a "stupid bitch" or "dumb cunt," he "freaked

---

[17] *Accord Nelson*, ¶ 23 (construing the "threatening, profane, or abusive language" element of § 45-8-101, MCA, to apply to words that, "by their very utterance, inflict injury or tend to incite an immediate breach of the peace" (citation omitted)).

[18] This is the rule, even in jurisdictions where the disorderly conduct statute expressly contemplates conduct occurring "in a public or private place." *State v. Schwebke*, 2002 WI 55, ¶¶ 24, 30-31, 664 N.W.2d 666 (construing Wisconsin's disorderly conduct statute, which provides: "whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty" of disorderly conduct).

[19] "The crime of disorderly conduct is not intended as a catchall for every act which annoys or disturbs people; it is not to be used as a dragnet for all the irritations which breed in the ferment of a community. It has a specific purpose; it has a definitive objective; it is intended to preserve the public peace; it has thus a limited periphery beyond which the prosecuting authorities have no right to transgress any more than the alleged criminal has the right to operate within its clearly outlined circumference." *Greene*, 189 A.2d at 145.

19

out," "[j]ust basically took off," "ran out," and "drove off." Immediately before uttering those words, Baertsch was hugging K.W., apologizing, and telling her he loved her; immediately after, he was fleeing the scene upon learning K.W. had called police.

¶32 The State presented no evidence upon which a rational juror could conclude that Baertsch's calling K.W. a "stupid bitch" or "dumb cunt" within her private home breached the public peace. Unlike in *Batten* and *Bennett*, no crowd formed after Baertsch said those words inside K.W.'s residence; and, despite K.W.'s testimony that she "didn't want her neighbors . . . to have a big ordeal about it," there was no resulting neighborhood commotion. Unlike in *Ashmore*, *Granby*, and *Turley*, there was no accompanying tirade or obscene or threatening gestures. Unlike in *Batten*, *Granby*, and *Nelson*, there were no children present. Unlike in *Compas*, there was no evidence or argument that Baertsch intended his language to annoy or harass K.W., as opposed to being uttered out of sheer exasperation and frustration.[20] Unlike in *Felando* and *Turley*, there was no evidence that Baertsch meant his words to be a warning or threat, especially given that he fled K.W.'s presence immediately after saying the words. Unlike in *Lowery* and *Granby*, there was no ensuing physical altercation. Finally, even though Baertsch's words may have caused "hurt feelings, offense, or resentment,"[21] there was no evidence his words could or did provoke K.W., or anyone within earshot, to immediate violence.[22]

---

[20] *See Dugan*, ¶ 45.

[21] *See Dugan*, ¶ 45.

[22] Compare the unprotected "fighting words" punishable under § 45-8-101, MCA, in *Robinson*, ¶¶ 8-12, 15-24, and *Nelson*, ¶¶ 23-24, *supra* note 9.

¶33 The Dissent emphasizes that Baertsch's conduct—bursting violently into K.W.'s home—caused K.W. to feel fear and apprehension.[23] However, the State charged this burglary specifically alleging disorderly conduct as the predicate offense based on the language Baertsch used "therein." Although K.W. indeed felt fear, that fear was an element of the separately charged PFMA offense. The Dissent suggests that any abusive language accompanying the violent entry satisfies the statutory requirement of "disturbing the peace." However, as our case law clearly delineates, the conduct or language constituting the predicate disorderly conduct at issue here must have occurred distinctly "within" the "occupied structure." As the State expressly argues, that language was Baertsch's calling K.W. a "stupid bitch" or "dumb cunt" "*after* kicking in [her] front door to gain access to her residence."

¶34 Just as kicking in K.W.'s front door was the basis for the standalone criminal mischief charge, Baertsch's conduct outside K.W.'s home (his yelling loudly at her from the front porch and in the front yard) arguably could have supported a standalone charge of disorderly conduct. *See* § 45-8-101(1)(b), MCA ("knowingly disturb[ing] the peace by making loud or unusual noises"). However, the State did not charge Baertsch with disorderly conduct for those statements or that conduct. Instead, the State, at its discretion, charged Baertsch with burglary under § 45-6-204(1)(b), MCA, with disorderly conduct

---

[23] The Dissent also states that the jury "was free to view with skepticism Baertsch's approach to hug K.W. and express his love for her," but that skepticism would necessarily pertain to the reasonableness of K.W.'s apprehension of bodily injury, an element of PFMA, not disorderly conduct.

under § 45-8-101(1)(a)(iii), MCA, as the predicate offense, meaning only Baertsch's conduct after unlawful entry and "within" the occupied structure could constitute the predicate offense. *See Rodriguez*, ¶¶ 12-24, 31-32; *Tellegen*, ¶¶ 24-25; *Wells*, 202 Mont. at 353, 651 P.2d at 389; *Solis*, 163 Mont. at 295, 516 P.2d at 1158.

¶35 When reviewing the sufficiency of the evidence to sustain a conviction, we are bound by the State's choice in framing the charges. *See Rodriguez*, ¶ 32; *Tellegen*, ¶ 25; *Brandt*, ¶ 17. Here, the State presented no evidence that Baertsch's calling K.W. a "stupid bitch" or "dumb cunt" while inside her private home, out of public view, caused or could have caused a public tumult or disturbed the public peace, order, or safety of the community at large. Accordingly, we hold that, even viewing the trial evidence in a light most favorable to the State, there was not sufficient evidence upon which a rational juror could have found beyond a reasonable doubt that Baertsch committed burglary with the predicate offense of disorderly conduct.

¶36 *2. Did the District Court impose an illegal sentencing condition restricting the Defendant's right to seek early termination of his sentence?*

¶37 Baertsch contends that the District Court illegally restricted his ability to seek early termination of his sentence under § 46-18-208, MCA. The State answers that Baertsch waived any challenge to the sentencing restriction by failing to object below and, in any event, the District Court was authorized under §§ 46-18-201(4)(p) and -202(1)(g), MCA, to impose the restriction.[24] We may review a defendant's claim that his sentence is illegal

---

[24] "When deferring imposition of sentence or suspending all or a portion of execution of sentence, the sentencing judge may impose on the offender any reasonable restrictions or conditions during the period of the deferred imposition or suspension of sentence," which may include "any other

or exceeds statutory mandates "even if no objection is made at the time of sentencing." *State v. Garrymore*, 2006 MT 245, ¶¶ 10-15, 334 Mont. 1, 145 P.3d 946 (citing *State v. Lennihan*, 184 Mont. 338, 602 P.2d 997 (1979)). The appropriate remedy for an illegal sentencing condition that does not affect the entire sentence is remand to the lower court to strike the condition from the sentence. *State v. Heafner*, 2010 MT 87, ¶ 11, 356 Mont. 128, 231 P.3d 1087.

¶38 Section 46-18-208(1)(b), MCA, provides that a defendant may seek early termination of a suspended sentence upon serving "3 years or two-thirds of the time suspended, whichever is less," and if he "has been granted a conditional discharge from supervision under" § 46-23-1011, MCA, and "demonstrated compliance with the conditional discharge for a minimum of 12 months."

¶39 In *Brady*, ¶¶ 28-30, we held that §§ 46-18-201(4)(p) and -202(1)(g), MCA, do not provide a District Court unilateral authority to restrict a defendant's right to seek early termination of a deferred or suspended sentence under § 46-18-208, MCA. However, a defendant may agree to waive or restrict the statutory right to seek early termination of a deferred or suspended sentence in a plea agreement. *Brady*, ¶¶ 31-36 (plea agreement provision limiting the defendant's ability to seek early termination of his deferred sentence for two years instead of statutory 18 months was enforceable where the defendant

---

reasonable restrictions or conditions considered necessary for rehabilitation or for the protection of the victim or society" or "any other limitation reasonably related to the objectives of rehabilitation and the protection of the victim and society." Sections 46-18-201(4)(p), -202(1)(g), MCA.

knowingly agreed to the condition in exchange for the State's deferred sentence recommendation).

¶40 Here, Baertsch did not enter into a plea agreement with the State and instead proceeded to a jury trial where he was convicted of PFMA, Burglary/Disorderly Conduct, and Criminal Mischief. The District Court sentenced Baertsch to two consecutive five-year suspended sentences on the PFMA and Burglary offenses and then restricted Baertsch's ability to seek early termination of those sentences for seven years. We hold that the District Court was not authorized to impose such a restriction on Baertsch's right to seek early termination of his sentence.

## CONCLUSION

¶41 We hold that there was not sufficient evidence to support Baertsch's conviction on the offense of Burglary with the predicate offense of Disorderly Conduct and vacate that conviction. We further hold that the seven-year restriction on Baertsch's right to seek early termination of his remaining five-year suspended sentence for PFMA is an illegal sentencing condition. We remand to the District Court with instruction to strike the illegal sentencing condition in accordance with this opinion.

/S/ KATHERINE M BIDEGARAY

We Concur:

/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA

24

Justice Beth Baker, concurring in part and dissenting in part.

¶42 Disorderly conduct is an "offense[] against public order." *See* Title 45, chapter 8, MCA. A person commits the offense of disorderly conduct if "the person knowingly disturbs the peace by . . . making loud or unusual noises [or] using threatening, profane, or abusive language[.]" Section 45-8-101(1), MCA. As the Court acknowledges, proof of the offense does not require a showing that the peace of multiple persons be disturbed. Opinion, ¶ 23. And neither the statute nor our precedent requires that there be a "resulting neighborhood commotion" or "ensuing physical altercation." Opinion, ¶ 32. *See*, *e.g.*, *Felando*, 248 Mont. at 150-51, 810 P.2d at 293; *Granby*, 283 Mont. at 200, 919 P.2d at 1010; *Turley*, 164 Mont. at 232-34, 521 P.2d at 690-91; *Compas*, ¶¶ 18-19; *Nelson*, ¶¶ 9, 20 (all finding sufficient evidence to support disorderly conduct conviction without proof of any such response to the offender's conduct). Here, viewing the evidence in the light most favorable to the prosecution, I would conclude that a rational trier of fact could have found the essential elements of the charged burglary beyond a reasonable doubt. *Rodriguez*, ¶ 10. The following facts in the record lead me to that conclusion.

¶43 The doorbell video establishes that Baertsch—yelling obscenities—was on and crossing the threshold of K.W.'s doorstep as he kicked the deadbolted door open and burst into her home. She already was scared that night because he was "being crazy" and panicked when she saw his headlights returning to her house because she did not know what was going to happen. She called her brother because she thought he might get there sooner than the police. K.W. said also that Baertsch was "freaking out" and she "didn't want [her] neighbors to have—[she] didn't [want] a big ordeal about it." Even after

25

Baertsch and the police had left, she stayed the night at her sister's home because she was afraid and did not know if Baertsch would come back.

¶44 By convicting Baertsch of partner or family member assault, the jury found that these actions caused K.W. reasonable apprehension of bodily injury. The same evidence supports a finding that Baertsch disturbed the peace—at least of K.W.—and that his conduct had at least the "potential to disturb" the order and tranquility in her neighborhood. Opinion, ¶ 30. The Court's conclusion that Baertsch's calling K.W. a couple of derogatory names was insufficient evidence of disorderly conduct occurring "within" K.W.'s home is, in my view, unduly restrictive. As Baertsch burst violently into her living room in the middle of his abusive rant, K.W. was on the phone with law enforcement out of fear of what might be coming. The jury was entitled to view with skepticism Baertsch's approach to hug K.W. and express his love for her. The words he uttered immediately upon learning she had called for help certainly were as profane and abusive as others we have found sufficient under the statute (Opinion, ¶¶ 19-20). Baertsch's tirade on the threshold of K.W.'s doorstep and as he forced entry into her home could be found disorderly even without evidence that the neighbors heard him and "came outside to investigate the yelling[.]" Opinion, ¶ 26. Considering the evidence in its entirety and in a light most favorable to the State, I would find it minimally sufficient for the jury to find that he disturbed K.W.'s peace within the structure of her home.

¶45 Though the Court's reversal renders it unnecessary to consider the claim, I also would conclude that Baertsch has not demonstrated ineffective assistance of trial counsel. First, on his argument that counsel improperly conceded the predicate offense in his closing

26

argument, defense counsel appears to have been attempting to show Baertsch's acknowledgment that he did some inappropriate things that night, which counsel admitted the jury plainly had seen on the doorbell videos. But he was strenuous that there was no burglary committed, and he explained his position why—that Baertsch did not enter the home unlawfully because he was living there at the time. This reflects a matter of trial strategy within the broad latitude afforded counsel. On his second argument, I would conclude that counsel's failure to offer an instruction on "fighting words," even if deficient, would not meet the prejudice standard of the *Strickland* test because Baertsch has not demonstrated a reasonable likelihood that if it had been given, the outcome would have changed. *See State v. Secrease*, 2021 MT 212, ¶ 13, 405 Mont. 229, 493 P.3d 335 (citing *Strickland v. Wash.*, 466 U.S. 668, 104 S. Ct. 2052 (1984)). Finally, a record that is silent about the reasons for counsel's actions or omissions seldom provides sufficient evidence to rebut the "strong presumption" that counsel's actions fell "within the wide range of reasonable professional assistance." *State v. Sartain*, 2010 MT 213, ¶ 30, 357 Mont. 483, 241 P.3d 1032 (citations omitted). Baertsch has not, in my opinion, established a record-based claim of ineffective assistance.

¶46 I join the Court's disposition of Baertsch's final claim. I add only that although § 46-18-208, MCA, grants an offender the right to *seek* early termination of his sentence, the court ultimately retains discretion whether to grant such relief.

¶47 I would affirm the burglary conviction and remand for amendment of the judgment in accordance with the Opinion.

/S/ BETH BAKER


Chief Justice Cory J. Swanson and Justice Jim Rice join in the concurring and dissenting Opinion of Justice Beth Baker.


/S/ CORY J. SWANSON
/S/ JIM RICE